# **<u>EXHIBIT 8</u>**

1    TRAN

                              DISTRICT COURT
2

3                          CLARK COUNTY, NEVADA

4                              *  *  *  *  *

5

6    FTE NETWORKS, INC., ET AL.,    )
                                    )    CASE NO.   A-25-928633-B
7                    Plaintiffs,    )
                                    )
8    vs.                            )    DEPT. NO.   IX
                                    )
9    MICHAEL BEYS, ET AL.,          )
                                    )    **Transcript of Proceedings**
10                                   )
                     Defendants.    )
11   _____)

12      BEFORE THE HONORABLE MARIA GALL, DISTRICT COURT JUDGE

13    **PLAINTIFFS' EX PARTE MOTION FOR A TEMPORARY RESTRAINING
      ORDER AND PRELIMINARY INJUNCTION; AND, IN THE ALTERNATIVE,**
14        **PETITION FOR WRIT OF MANDAMUS OR PROHIBITION ON OST**
                     MONDAY, OCTOBER 6, 2025
15

16   APPEARANCES (ALL VIA ZOOM):
       For Goodwin, Cunningham,
17       And Coleman:            CHAD F. CLEMENT, ESQ.
                                 NICHOLAS M. ADAMS, ESQ.
18

19    For FTE Networks:          ERIC D. WALTHER, ESQ.

20    For the Defendants:        JASON M. WILEY, ESQ.

21    RECORDED BY:               AIMEE CURAMENG, DISTRICT COURT
      TRANSCRIBED BY:            KRISTEN LUNKWITZ
22

23
      Proceedings recorded by audio-visual recording; transcript
24               produced by transcription service.

25

MONDAY, OCTOBER 6, 2025, AT 8:30 A.M.

1

2

3        THE COURT:  All right.  Very good.  This is case

4   number A-25-928633-B, the special setting of *FTE Networks,*

5   *Inc., and others versus Michael Beys and others*.  We're

6   here today on Plaintiffs' Ex Parte Motion for a Temporary

7   Restraining Order and Preliminary Injunction, and, in the

8   Alternative, a Petition for a Writ of Mandamus or

9   Prohibition on Order Shortening Time.  Just to be clear, we

10  are not proceeding ex parte.

11        Let me get appearances of counsel, please,

12  starting with plaintiffs' counsel and any client

13  representatives you have on that you want to introduce.

14        MR. CLEMENT:  Good morning, Your Honor.  Can you

15  hear me okay?

16        THE COURT:  I can.  Thank you.

17        MR. CLEMENT:  Just want to make sure.  Chad

18  Clement and Nicholas Adams of Marquis Aurbach on behalf of

19  plaintiffs Thomas Coleman, Stephen Goodwin, and Joseph

20  Cunningham.  I'm just trying to see who's on here.  It

21  looks like Mr. Cunningham is present.  Mr. Coleman is

22  present.

23        THE COURT:  All right.  Very good.

24        MR. CLEMENT:  Sorry.  I missed him when I was

25  scrolling through.

2

Exhibit 8
Page 2 of 53

1          THE COURT:  No worries.  Okay.

2          Mr. Walther?

3          MR. WALTHER:  Yeah.  Good morning, Your Honor.

4   Eric Walther for FTE Networks, Inc.

5          THE COURT:  All right.  Good morning.

6          Anyone on behalf of the defendants?  I think I saw

7   Mr. Wiley present?

8          MR. WILEY:  Good morning, Your Honor.  Jason

9   Wiley, bar number 9274, on behalf of defendants.

10          THE COURT:  All right.

11          MR. WILEY:  I will be the only one.

12          THE COURT:  All right.  Good morning, everyone.

13   So, let's take care of -- I've looked at all the papers.  I

14   did not read every single word of Judge Kishner's Findings

15   of Fact and Conclusions of Law.  But I did get the

16   highlights of what she did and what she didn't do.

17   Otherwise, I have looked at everything.

18          few weeks.  So, while I looked at everything, I

19   may not have been able to do as many passes as I would have

20   liked to have.  So, please, feel free to fill in the gaps

21   for me where you need to.

22          Let me dispense what kind of a threshold issue

23   that was presented in the papers, which is this issue of

24   service and notice.  Perhaps I could have been more clear

25   in my minute order when I was reassigned the case.  And,

3

Exhibit 8
Page 3 of 53

1  without supposing what the prior Judge intended in her OST,

2  but I intend -- before I proceeded and before I issued --

3  before I sent you all the e-mail with the minute order and

4  before I issued the minute order, I did check two things:

5  One, I reviewed the TRO to see if it was something I

6  intended to issue ex parte, and I didn't think it was

7  appropriate for ex parte relief; and, then, two, I went

8  ahead and issued a modified briefing schedule after seeing

9  that defendants had received notice.  Because, at that

10 point, I had initial Notice of Appearance from defense

11 counsel.

12         And, so, again, without supposing what the prior

13 Judge meant by service in the OST, I was fully aware that

14 notice had been provided.  And I was proceeding not on

15 service of process but on notice, given that Rule 65 and

16 the wealth of case law interpreting Rule 65 merely requires

17 notice when you're not proceeding ex parte, as opposed to

18 service of process.

19         So, for that purpose, I am denying any -- I want

20 to be very clear here because I'm going to move onto

21 another issue that may affect today's hearing.  For

22 purposes of proceeding today, I think notice is sufficient

23 and I'm denying any Countermotion based on notice versus

24 service of process to do this in the ordinary course,

25 including after process has actually been served.

4

Exhibit 8
Page 4 of 53

1      But I am moving on now to a separate issue, which

2  may affect today, which nobody has directly briefed, or I

3  think even indirectly briefed, which is there's some legal

4  issues and there's some factual questions that I have.  The

5  legal issues and questions that I have is how the filing of

6  the bankruptcies for the four subsidiaries of FTE Networks,

7  Inc., which is Mo Seven, Kaja Holdings, Kaja Holdings 2,

8  and Alan Investments III, how the automatic stay in those

9  bankruptcy proceedings impact this Court's ability to

10  provide relief today?

11      And, in -- I'm asking you the question somewhat

12  rhetorically.  But I'm also asking at -- rhetorically is

13  probably the wrong word.  But I'm also saying that I looked

14  into the law a little bit on this and the automatic stay is

15  broad.  And I think the automatic stay does impact today's

16  hearings because it is an act.  Today -- this lawsuit and

17  this hearing is an act to gain possession or control of the

18  debtor or the debtor's books and records.  Okay?  And that

19  is under -- that is a provision of the automatic stay under

20  U.S.C. 362.

21      I also looked into the case law on whether or not

22  the automatic stay arises if you have a petition that was

23  purportedly filed without authority.  And, while there is

24  some case law, meaning I found a singular case for -- and,

25  look, I didn't do a 50 -- it's probably not 50 states, but,

5

Exhibit 8
Page 5 of 53

1  you know, I didn't do a Bankruptcy Court survey on this

2  issue.  But I did find one case that said if a petition is

3  filed without authorization, it's void ab initio, and,

4  thus, the automatic stay never arose.  One case.

5       I found many, many more cases for the proposition

6  that you have to have that fight in Bankruptcy Court, that

7  the automatic stay does arise and you have to go to

8  Bankruptcy Court and you have to invoke one of two forms of

9  relief:  You have to either get a modification of the

10  automatic stay under 42 U.S.C. 362(d), or you have to move

11  to dismiss in the Bankruptcy Court.

12       I would think just having the fight in Bankruptcy

13  Court is easier than having the Bankruptcy Court ask me to

14  decide the issue after modifying or lifting the stay.  But

15  that would ultimately be up to the parties and to the

16  Bankruptcy Court.

17       There's a factual issue as well.  I don't know

18  what's going on in the bankruptcies right now.  I do not

19  have, unfortunately, access to PACER.  It was a 90-minute

20  wait for customer service this morning.  That timed out.

21  So, I could not get on PACER this morning to look to see

22  what has happened in the four bankruptcies since their

23  filing in July.

24       Setting aside the issue of the automatic stay,

25  there's another question that I have, which is, I'm not

Exhibit 8
Page 6 of 53

certain what the structure of this company is.  I
understand that FTE Networks -- or I'm guessing the
inference that I see in the papers is is that FTE Networks
is the parent company with a number of LLC subsidiaries.
But I have no idea how those subsidiaries are managed.

I -- if they're wholly owned subsidiaries, I fully
appreciate that ultimately control likely runs up to FTE
Networks.  However, it appears just looking at a couple of
the bankruptcy filings, it looks like for at least one LLC,
which is Kaja Holdings 2, there may be an intermediary
subsidiary called U.S. Home Rentals, LLC, that's the
managing member, and that Mr. Beys might be the authorized
party, whatever that is, because I'm really not sure what
that is, for U.S. Home Rentals, LLC.

And, then, it looks like Mr. Beys was the
president of Alan Investments III, LLC, and I don't know if
he was removed as president.  It sounds like he was removed
as a director and an officer of FTE Networks.  But I don't
know if he was removed as a president or someone with
authority, for instance, for Alan Investments.

And, then, I simply have no information for Mo
Seven, and then Kaja Holdings -- I guess there's no 2.  So,
1, or just nothing.

So, I have, you know, factual questions that,
setting aside the automatic stay, that I want answers to

Exhibit 8
Page 7 of 53

1    before I proceed it.

2            Going back to the automatic stay, there is
3    possibly some relief I could provide today carved out of
4    the stay.  For instance, information or actions taken
5    solely with regard to FTE Networks, which is the parent
6    company.  But the way the Proposed Order is written, I
7    think the automatic stay applies at least -- because I
8    think the automatic stay at least applies to the subs, I'm
9    not sure the Order, as written, is something I could enter.

10           And, then, I would also have factual questions of
11   -- going back to the structure, I'm not sure if FTE
12   Networks has its own -- like, for instance, documents, or
13   evidence, or materials that belong solely to FTE Networks,
14   as opposed to some -- you know, as opposed to joint
15   information or joint ownership with the subs in bankruptcy.

16           So, I have a lot of questions.  I'm not sure the
17   best way to proceed.  But let me open the floor up to Mr.
18   Clement, or Mr. Walther, who filed the Motion.

19           MR. CLEMENT:  Sure.  Thank you, Your Honor.  And
20   thank you for taking some time this morning on a special
21   setting.  I know you're traveling, and we certainly
22   appreciate the time and attention to this.

23           I mean, I -- I'm happy to structure this however.
24   I could dive into the automatic stay issues, if you'd like,
25   --

8

Exhibit 8
Page 8 of 53

1    THE COURT:  Yeah --

2    MR. CLEMENT:  -- and address those first.  And,

3 then, you know, we can either move on to Mr. Wiley or come

4 back to the merits.  But, I mean, for --

5    THE COURT:  Let's [inaudible] the stay, just

6 because I'm concerned about proceeding because -- and, you

7 know, no party raised this, but because the stay also, if

8 it's applicable, which I think it is, because it also

9 applies to me, I'm proceeding cautiously.

10    MR. CLEMENT:  Right.  Right.  Understood, Your

11 Honor.

12    Well, I'll be candid, I have not -- had never

13 thought that it applied.  Not saying that I'm right or

14 wrong.  But I really had not -- I do not fully understand

15 all of the ins and outs of FTE and its subsidiary structure

16 on this.  I'll just be candid, I really don't.

17    I do know that FTE itself is not in bankruptcy.  I

18 would take the position that, based upon that, that the

19 automatic stay as to what we're requesting -- and I think

20 the Court could be correct to the extent that it goes far

21 enough to deal with entities and bankruptcy.  I certainly

22 appreciate that.  I can understand that.  But I think with

23 the more core kind of targeted issue that we're trying to

24 address, which is who has authority to act on behalf of

25 FTE, I think that that is fair game, at least from our

9

Exhibit 8
Page 9 of 53

standpoint.

I also don't think FTE thinks the stay applies. And let me give you a couple of reasons. The litigation over in front of Judge Kishner more or less just wrapped up post-judgment motions, like within the past week or two. There's an appeal pending. That case has been quite active with respect to, you know, fees, costs, interest, those kinds of things that are typical in a post-judgment setting. FTE has never suggested that the stay applies at any point in time.

Furthermore, we became aware recently that FTE has filed some additional cases against parties related to this case. I found out that they filed a case challenging Innovativ's shareholder status, even though Judge Kishner said they were a definitive shareholder, things of that nature. Those were recent.

So, I guess our position is that the stay as to the core issue of authority, those kinds of things, I don't think applies. I don't think FTE is in bankruptcy. I think it's before the Court for a decision. But I do understand that, to the extent that it would go into some of the subsidiary issues, you know, I'd acknowledge that that could be an issue.

I candidly do not know, with respect to your questions about the books and records, I don't know exactly

10

Exhibit 8
Page 10 of 53

what exists.  I really don't.  I think that's part of the
problem.  You know?  The Board -- nothing's been turned
over.  We haven't received any form of response to any of
the notifications that we've given them about the election
and everything that's occurred.  So, I don't know that we
really have a good sense of what exists, how it's
structured, who it's owned by.

I mean, ultimately, I think it's all owned by FTE.
FTE, by the way, is a public company.  They've been de-
listed.  But when it was reporting information, which it's
not currently, everything was reported to FTE.  So, I do
think that that -- you know, that that's where ownership
and possession lies ultimately.

THE COURT:  Mr. Clement, just a quick question.  I
don't think it really has to do anything with today, but I
think FTE used to trade on the New York Stock Exchange.
Right?

MR. CLEMENT:  Correct.

THE COURT:  When it was de-listed, did it move
over to another exchange, like the Pink Sheets?  Or is it -
-

MR. CLEMENT:  My understanding is it just was
entirely de-listed.  It's not on any exchange.

THE COURT:  Okay.

MR. CLEMENT:  It hasn't --

11

Exhibit 8
Page 11 of 53

1   THE COURT:  It didn't go private transaction.

2   Right?

3   MR. CLEMENT:  I don't know.  I don't know how much

4   is going on with the stock.  I'm just not -- I'm not as

5   familiar with it.  I know it's de-listed.  I know it's been

6   de-listed for quite some time.  I know there's not public

7   reporting.  There hasn't been an election as we put forward

8   in, you know, seven plus years.

9   So, I do know that they went into being their own

10  transfer agent.  That was an issue in front of Judge

11  Kishner and was a lot of concern, something we had to

12  litigate quite heavily over there.  But, yeah.

13  THE COURT:  What -- you mentioned that FTE has

14  filed some lawsuits, including against Innovativ, which is

15  the -- what Judge Kishner found to be the majority

16  stockholder.  So, obviously, there's a control fight going

17  on right now.  So, when you say FTE filed, can you be more

18  specific as to who on behalf of FTE filed that lawsuit

19  against Innovativ?

20  MR. CLEMENT:  Yeah.  I mean, the plaintiff is FTE

21  Networks.  And Mr. Wiley is the counsel of record in that

22  case, along with Mr. Cereghino.  His firm, I think, is

23  called Lex Domus Law.  They were the counsel of record.

24  And I think they filed multiple cases from what I recall.

25  THE COURT:  Okay.  So, it's -- so, basically, Mr.

12

Exhibit 8
Page 12 of 53

Beys and his group of persons --

MR. CLEMENT: Yeah. Well, correct. So, you have an interesting issue here. Right? The named plaintiff in that case is FTE Networks, represented by different attorneys, and today, Mr. Walther, who represents FTE Networks, because ultimately it goes back to that core issue of who wanted to represent officers who do have authority to retain counsel, act on behalf of the company sort of thing.

I -- yes. The FTE Network's group that instituted that case are what we believe are the former directors and officers, Mr. Beys, Mr. Silva, Ms. Fernandez, all of those individuals. I do believe that's who communicates with Mr. Wiley and that's who purports to direct the affairs --

THE COURT: Of FTE.

MR. CLEMENT: -- of FTE.

THE COURT: And when and where was that case filed?

MR. CLEMENT: It was filed in Federal District Court here in Nevada. I don't have the exact date off hand, but we found out about it. Mr. Wiley or Mr. Cereghino put a footnote in a brief to the Nevada Supreme Court, I think it was last week, just saying they filed a new case. But it's within the past few weeks, I believe.

THE COURT: Okay.

Exhibit 8
Page 13 of 53

1    MR. CLEMENT:  I could probably find the exact date

2  for you.  I was not aware of it when it was filed.  They

3  didn't notify us or any of my clients.  I found out about

4  it from a footnote in a brief to the Nevada Supreme Court,

5  in connection with a Reply in Support of a Motion to Stay.

6         THE COURT:  Got it.

7         Mr. Walther, do you have anything to add to any of

8  the issues on behalf of -- I guess, punitively, on behalf

9  of FTE?

10        MR. WALTHER:  Yes.  Thank you, Your Honor.  So, a

11  few things.

12        I think -- and I'll give you some details because

13  I do have some of the dates regarding those federal cases.

14  But I think the filing of those federal cases is just a

15  really good example of why we're here seeking the relief

16  that we're seeking.  You have former officers and directors

17  purporting to hire counsel and file lawsuits on behalf of

18  the company, when the record is extremely clear that they

19  no longer have the authority to do that.

20        As far as the automatic stay, I do want to just --

21  I agree with Mr. Clement that if the relief that we're

22  requesting here is limited to FTE, the parent company here,

23  I don't think there's any issues with the stay relating to

24  the subsidiaries.  I know that the TRO, the Proposed TRO we

25  submitted, may go a little too far in including some of

14

Exhibit 8
Page 14 of 53

those subsidiaries. But, if we're limiting the relief to, you know, actions taken on behalf of the parent, books and records that belong to the parent company only, I think that that relief can be granted without running into any issues with the automatic stay.

As far as the federal lawsuits, Your Honor, and this is Exhibit 10 to our Motion, I sent a demand letter for books and records. It was the last of many demands, written demands, asking for books and records, account information, again, informing these former officers and directors of the actions taken to amend the bylaws, the election that took place for the Board of Directors where the majority shareholders elected in the current Board of Directors. And we set the deadline for them to provide the books and records of September 16th, hoping that we could, you know, not have to come to you, not have to come to the Court, but we set a deadline of September 16th. I believe they filed those federal lawsuits on behalf of the company the day before, September 15th, without informing us of it.

Like Mr. Clement said, we, you know, find reference to it in a filing. But they filed the day before our deadline to provide books and records. And I'll just tell you, Your Honor, that those federal lawsuits I think can only be described as frivolous filings. They seek one cause of action, declaratory relief, which is really a

15

Exhibit 8
Page 15 of 53

State Court claim.

They claim that they have federal subject matter jurisdiction by citing some random, obscure federal statute saying in certain types of cases that don't apply here, if a Federal Court already has subject matter jurisdiction, it can grant declaratory relief. They're trying to use that as a basis to get into Federal Court, which, you know, I think is kind of crazy because it's very obvious there's no subject matter jurisdiction in the Federal Court. The issues they raise in those cases are things that were directly addressed, litigated, and resolved by Judge Kishner.

It's pretty clear, just given the timing here, that this was an effort by them to run to the Court to stay out of State Court because they did not have a good result last time they were in State Court, they were unhappy with Judge Kishner's ruling, to just get something on file on behalf of the company.

But, you know, they did not have the authority to file that lawsuit and they're continuing to take action, not only in those federal cases but in other lawsuits in other jurisdictions on behalf of the company without the authority to direct counsel in those separate cases.

So, just a little context. I don't know if that answered questions that you had for me or not. But I'm

16

Exhibit 8
Page 16 of 53

1  happy to give more detail.

2        THE COURT:  I have one question, which is a

3  practical question.  If I granted -- you effectively seek

4  two forms of relief.  And, putting the subsidiaries aside,

5  you want a temporary restraining order restraining

6  defendants from acting on behalf of FTE.  And, --

7  subsidiaries aside, and you want a temporary restraining

8  order -- you want a turnover of books and records belonging

9  to FTE.

10        With regard to the books and records request, as a

11  practical matter, are there books and records that belong

12  only to FTE and not to any of the four subsidiaries to

13  include any intermediary managing member subsidiaries?  I

14  really -- it would be really helpful, I'm sure, to all of

15  us, if we had some type of org chart here.

16        MR. WALTHER:  Certainly, Your Honor.  And I think

17  you raise a really good point here.  And I think one of the

18  reasons that we can't give you more specific answers on

19  some of these things is because these rogue former officers

20  and directors are -- intentionally withheld all the

21  information that would answer the questions that you have

22  for us.  So, I can't tell you definitively whether there's

23  -- what the books and records look like, if they're

24  exclusive to the parent company, if there's different sets

25  of books, I can't tell you all that information because

17

Exhibit 8
Page 17 of 53

they are completely outright refusing to provide any

financial information to the current Board or the company.

So, I think, though, if you were -- if you

tailored a TRO to say that it's only covering books and

records that belong to FTE, I think that that may alleviate

some of the concerns about running afoul of the automatic

stay.

But, to answer your question, we just don't know

because they've refused the demands from the current Board

of Directors and interim CEO to provide any information

relating to the financials of the company.

THE COURT:  So, as -- and, I'm looking into the

future here, when -- if they -- if defendants took the

position, well, there really are no records that belong

exclusively to FTE, then do I have this evidentiary -- do I

have an evidentiary hearing to determine, and how do I

determine with the subsidiaries and bankruptcy, which books

belong to FTE and which books belong to the subsidiaries?

MR. WALTHER:  No.  It's a fair --

THE COURT:  [Inaudible] question.  And --

MR. WALTHER:  It's a fair question, Your Honor.

And, you know, I don't know if Mr. Wiley can shed some

light on whether there are books that belong just to FTE.

But, like I said, if we tailor the relief today to

just include books and records for FTE, I don't know if Mr.

Exhibit 8
Page 18 of 53

Wiley may be able to tell us if their position is going to
be that those don't exist.  If that is their position, I
think we could have an easy evidentiary hearing.  We have
the accountants for the company that are also refusing
requests.  And our understanding is that is at the
direction of Mr. Beys, refusing requests to hand over books
and records.  I think we can get some clarity from them on
how these books and records are structured and, you know,
what belongs just to FTE.

I will say, just from experience, a parent company
in an enterprise like this, I would think would have, to
some degree, its own, you know, its own books and records.
But, again, we don't know because they won't provide us any
information.  But, I think if it came down to having an
evidentiary hearing, you know, I think it could be a very,
very straightforward one where we're just asking the
accountants to explain how these books and records are
organized and do so under oath.

THE COURT:  Do you know what's going on with the
bankruptcies?  Just because of my inability to get into
PACER at all.

MR. WALTHER:  Yeah.  I have not checked the docket
for a few days.  One of my bankruptcy colleagues is keeping
an eye on it.  The one thing I do know is that an Order was
issued to do joint administration for all of the -- all the

Exhibit 8
Page 19 of 53

subsidiaries, essentially under one case. But I know that there was an initial creditors' meeting where I think it was an attorney for the City of Chicago who was very unhappy about the filing of these bankruptcies, had some tough questions for Mr. Beys about his reasoning for filing those bankruptcies, and his authority, and things like that.

So, there was an initial creditors' meeting that was continued, and then continued again, and my under -- I think that the continued creditors' meeting either happens today or maybe within the next few days.

THE COURT: Was --

MR. WALTHER: So, it's in the very early stages, Your Honor.

THE COURT: Right. Although, I feel like because of how fast bankruptcy moves, first day motions and all that, that this is a lifetime almost since the filing.

But, have you all -- has, I guess, your contingency, is the only way I can -- have you all -- without revealing any privilege, have you contemplated seeking relief from the Bankruptcy Court?

MR. WALTHER: So, I think that, on behalf of the subsidiaries, it's going to be appropriate to take action in the bankruptcy. And my understanding is that the trustees -- they're Chapter 7 bankruptcies, that the

20

Exhibit 8
Page 20 of 53

trustee, understanding that there's some issues on the
authority to file in the first place, has indicated his
desire to have some intervention by the true, you know,
Board and governing individuals of the parent company.  I
think there is some concern, you know, that if some motion
is brought on behalf of the subsidiaries that there's a
high likelihood the Bankruptcy Court is going to say, you
need to go to Nevada and have a Court resolve who's in
charge of the parent company, that all of the ownership
ultimately flows to who is not a debtor within the
bankruptcy.  So, there's some concern there.

      I think, if you were able to provide some relief
just to the parent company, that, I think, would help
expedite the relief that's -- that would be sought within
the bankruptcy with regard to the subsidiaries.

      THE COURT:  Okay.  All right.  Let me hear from
Mr. Wiley.  Mr. Wiley?

      MR. WILEY:  Yes, Your Honor.

      THE COURT:  And, do you have anything -- I read
your Opposition and I -- you know, I appreciate that you're
appellate counsel and I appreciate that Mr. Cereghino, I
guess, is returning today or tomorrow from vacation.  But
do you have anything to add to this discussion?

      MR. WILEY:  Sure, Your Honor.

      You know, with respect to the whole notice issue -

21

Exhibit 8
Page 21 of 53

1 - and I know you touched on it briefly and I know what your
2 position is. I guess I was unclear, based upon your minute
3 order, and reaching out to the parties indicating that you
4 set this new briefing schedule and as to whether or not
5 there was effectuated service or no -- whatever we want to
6 call it, in the order shortening time did say service. You
7 know, I was of the position that certain efforts needed to
8 be undertaken by that noon on that Thursday. And, you
9 know, whether or not the minute order indicated that -- you
10 know, you deemed that to be sufficient or whatnot, I mean,
11 I guess that's a little bit up for clarification. So,
12 that's why we proceeded as if we proceeded.

13     I think what you're hearing form my opposition
14 today, and my opposing colleagues, is, you know, the issue
15 that we had with the underlying Motion, and that is it's
16 about as clear as mud right now as to, you know, what that
17 -- this faction of FTE is trying to accomplish. It seems
18 to me that they're casting an extremely wide net. The
19 Order is not narrowly tailored, or the Proposed Order is
20 not narrowly tailored. You know? There are issues with
21 the bond that needed to be fleshed out.

22     And I do take a little bit of umbrage with respect
23 to Mr. Walther indicating that I am filing a frivolous
24 motion. I think -- I believe my reputation is somewhat
25 healthy in this legal community. And I don't file

22

Exhibit 8
Page 22 of 53

frivolous motions.

And what that -- those two -- what those Fed Court cases relate to is it relates to an Order that Judge Mahan provided way back in 2022 with respect to issues related to shares, the issuance of shares, who controls the shares, who owns the shares. And these are issues that are paramount and front and center in the underlying Supreme Court appeal that is currently pending.

And this is where we get a little bit of -- it's a little bit weird, because I was brought in, I represented FTE. I have provided and filed liens on behalf of FTE. We are appellate counsel with respect to FTE. And, now, you know, we received these corporate resolutions when the shares and the controlling interests are still at issue.

I agree with the plaintiffs here that, you know, Judge Kishner made a determination as to the validity of certain amendments. You know? Whether or not Judge Kishner's ruling was 100 percent correct, that's still up for debate.

And, again, it all reverts back to our position that, you know, Judge Mahan made a determination as to the validity of the issuance of shares. That issue was brought up in front of Judge Kishner and she disregarded it. Again, whether that's right or wrong, that's going to be fleshed out.

23

Exhibit 8
Page 23 of 53

So, when you add the two Fed Court actions, the fact that the matter is on appeal with the Nevada Supreme Court, which, again, was not -- not only was it not raised, it wasn't even mentioned in the Motion for Preliminary Injunction, this leads to a whole myriad of issues that we have moving forward. Again, I'm wearing an FTE hat. Mr. Walther is wearing an FTE hat. You know? There's -- these are all matters that need to be fleshed out.

Your Honor indicated that there's a potential issue with respect to bankruptcy. Candidly, I would agree with Mr. Clement, I don't know what those issues are. But I do believe that these matters need to be addressed. I'm not saying that plaintiffs filed their Motion in haste. But it could have been more complete and comprehensive.

And we, collectively, Mr. Cereghino, myself, I need to get together with Mr. Beys, you know, that's why we were trying to request a little bit more time to have this thing -- to have the hearing, number one; and, number two, to be able to adequately oppose all of the issues that were raised in Plaintiffs' Motion.

I tried to reach out to Mr. Clement to see if we could stipulate to some sort of briefing schedule and he didn't return my call. That's fine, but plaintiffs knew that Mr. Cereghino was going to be out of the country. And Mr. Cereghino was trial counsel. He has a heck of a lot

24

Exhibit 8
Page 24 of 53

more institutional knowledge than I do with respect to this matter.

So, based upon that, Your Honor, I think what sounds like is probably the apt thing to do is if there's any issues that plaintiff have in the interim before these matters can be fleshed out, if they can point to, you know, don't do A, B, or C as it relates to the prohibitory injunctive relief. Well, okay, maybe Your Honor fashions a temporary restraining order based upon those issues, but allows for the parties to brief allegations that were raised in the Motion, about the issues that Your Honor raised today regarding the bankruptcy and the other ancillary matters, so that there can be complete and comprehensive knowledge that the Court has in making a determination on the preliminary injunction.

The issues regarding the interplay between FTE and its subsidiaries, quite frankly, I don't know that either. But, again, I believe that that should be addressed as well. So, before we go hastily and try to enter certain orders, I think that would be the appropriate way to handle this matter, to allow for everything to maintain status quo.

And, again, plaintiffs have the issue. I don't believe there's been any actions or events that plaintiffs would take umbrage with, since they've, number one, filed

Exhibit 8
Page 25 of 53

1 this Complaint; and, number two, filed the Motion for

2 Preliminary Injunction, ex parte. If there are, please let

3 me know. I mean, I think that, you know, we would want to

4 address those.

5 But, again, I don't think there's any smoking gun

6 out there that requires, you know, us to stand down. But

7 let's just have everything status quo, allow for these

8 matters to be fleshed out, and if we need to have an

9 evidentiary hearing, great. But I think it's one that

10 could probably be determined through oral argument, such as

11 we're doing today, albeit probably in a courtroom setting.

12 THE COURT: Let me ask you, Mr. Wiley, what do you

13 think -- or what do your clients thing is the status quo?

14 MR. WILEY: So, they believe that everything --

15 because one thing that we do have pending is we do have a

16 Motion to Stay Proceedings before the Nevada Supreme Court.

17 Mr. Clement indicated that that matter has been briefed.

18 We don't have a determination on that.

19 To be -- Your Honor said, you know, you didn't go

20 through the full Finding of Facts and Conclusions of Law,

21 or if you did, I mean, it is 93 pages. So, I mean, I don't

22 fault you there. But, you know, Judge Kishner made

23 declaratory relief determinations with respect to three

24 amendments to the bylaws. She made a determination that

25 Amendment Number 1 and Amendment Number 2 were valid, which

Exhibit 8
Page 26 of 53

were raised or proffered by Mr. Clement's clients.  And, then, the third was raised by -- was not my client.

THE COURT:  Right.

MR. WILEY:  But, again, that's in trial.  I wasn't trial counsel.  But we believe that there's an issue with respect to that.

The best case scenario for the plaintiffs in this instance, if everything -- and the shares, and the issuance of the shares, and the voting breakdown, if that's all valid, I mean, those numbers are still pretty close to a majority.  I believe one is 57 percent and one is 53 percent.  You know?  The FTE contingent, my FTE contingent, believes that, you know, some of those shares that the issuance of them are at issue.

And because that relates back to Judge Mahan making a determination as to the validity of those shares.  And, in fact, Mr. Clement filed a Notice of Appeal with respect to that underlying Fed Court case, I believe that was on October 3rd.  So, that was just last week.  So, again, we've got a lot of moving parts here.

We've got a lot of issues that need to be fleshed out.  These matters all need to be addressed, you know, as it relates to the Fed Court actions, Mr. Clement's appeal, to Mr. -- or to Judge Mahan's Motion to Dismiss, which occurred in 2022.  You know, the Nevada Supreme Court

Exhibit 8
Page 27 of 53

underlying appeal. In fact, there's a Motion to Stay Proceedings there. And that's a sticky issue as well because we've got a monetary aspect and a nonmonetary aspect. So, there's some very intricate and unique legal issues that are at issue and apparent there.

So, I mean, I guess that -- that's kind of our position.

THE COURT: So, I'm not sure you answered my question, which is what -- there's a fight for control over the top line company right now. Let's put aside books and records for a second. But there's a fight between what I'll call the Beys contingency and then I can't remember who's -- the Innovativ. The Innovativ contingency. And, as far as I can tell, based on what's been provided to me today is -- and, let me back up for a second.

I know the conclusions that Judge Kishner reached in her FFCL. What I didn't, like, go through with a fine-toothed comb is, like, every single factual finding she made in order to reach the ultimate conclusion that the First Amendment is valid, the Second Amendment is valid, that the Third Amendment is not valid.

So, it seems that her -- at least as of right now, Judge Kishner's FFCL has not been stayed. It's been appealed. And it sounds like there's a Motion to Stay maybe with the Nevada Supreme Court, but it hasn't been

Exhibit 8
Page 28 of 53

stayed.  So, her declarations at the moment are valid.  It seems that the Innovativ contingency moved forward with resolutions and actions based on her declarations, moving the Beys contingency of officers and directors.

And, so, I'm trying to figure out, you know, what is the status quo?  Because I could decide what the status -- in one way, the status quo is without anything -- without any dispute, that the Innovativ contingency undertook these resolutions and actions.  It seems the status quo is:  Well, the Innovativ Group is in control now.

However, a week from now, maybe even tomorrow, -- I don't know if the Motion to Stay is fully briefed, I suppose the Nevada Supreme Court could stay Judge Kishner's ruling and then I suppose the status quo would revert back to the Beys contingency.  So, I'm not sure what I'm supposed to do.

And I'm not sure how, if I make a ruling today, keeping the Innovativ Group in control, how that impacts -- how that might be -- seriously, how that might be impacted by a later status quo ruling from the Supreme Court.  Would their ruling -- would their status quo ruling or stay ruling usurp my ruling, even though they're not making the ruling in my case?

MR. WILEY:  I believe it would, Your Honor,

Exhibit 8
Page 29 of 53

because what that would do is that would revert it back --
that would put literally -- or, not literally, but
figuratively, the toothpaste back in the tube.  Right?  I
mean, we would go back to the position that we were before
the Finding of Fact and Conclusions of Law were entered and
the fact that the Beys contingent did have the controlling
interest in the company.  That -- you know, that was the
determination at that time, or prior to Judge Kishner's
ruling.

So, I guess, you know, I would say our position
is, status quo is everything is sort of hands off.  You
know?  If there needs to be some sort of dialogue between
counsel in the event that FTE would need to undertake some
action, well, I mean, that's something that could be
determined and could be made part of an order if we get
that far.  You know?

If the Innovativ contingent moves forward with
control -- I mean, the biggest issue that I had,
personally, is, you know, they sent me correspondence
saying that I'm not authorized to represent FTE anymore,
even though we were trying to advance their appellate
rights.  So, you know, if their position was -- if I
adhered to their position and withdrew as my representation
of FTE, then, you know, FTE -- the controlling -- or the
Beys controlling FTE gets their appellate rights cut out

30

Exhibit 8
Page 30 of 53

from underneath them.

So, again, that's why this thing is a little bit convoluted. There are a lot of issues related to it. You know, what status quo means, you're right, it's different for the two entities. But, I think what could happen is, we could fashion some sort of system of checks and balances to make sure that, you know, nobody's undertaking any actions willy-nilly without the company's best interest in mind as we move forward and these issues get resolved.

THE COURT: All right. Let me go back to Mr. Clement. I had the same questions: What does status quo look like at the moment? And what might it look like going forward?

MR. CLEMENT: Yeah. No. I think it's a very good question. I've got a number of points here kind of in Reply and to the question.

Let me be straightforward. It is Beys's modus operandi to disenfranchise shareholders over and over. They take actions to cast doubt, say: Oh, there's other litigation pending. Oh, there's two new lawsuits. Oh, there's an appeal. Oh, there's a Motion to Stay pending. Okay?

If you -- and I totally appreciate the Court's pinched on time and hasn't been able to read that FFCL fully. But, if you read that FFCL fully, one of the

Exhibit 8
Page 31 of 53

reasons we obtained the special damages award that we obtained was that over, and over, and over again in that case, the Beys contingency undertook actions to disenfranchise the shareholders. And, to me, that's exactly what's going on again here today.

I mean, repeatedly in that case, attempted to just cancel people's stock, illegally issue stock to create roading block contingencies and do other things. And it's repeating here. He filed two new cases so they can cite them and say: Well, the shareholder status is up in the air. It's not up in the air. Judge Kishner fully considered all of these exact same arguments. This whole argument about Judge Mahan and another decision in Federal Court, either way, the decision wasn't as to Innovativ at all. It was another shareholder. It's an incredible misrepresentation. Okay?

But this is what they do. They create doubt, they file lawsuits, they disenfranchise shareholders, and basically try to say they don't have rights to say something, something's in doubt, this, that, and the other.

I think the Court nailed it when you cut against kind of these smokescreens and these things going on in the periphery that the Beys contingency is trying to point to. Before the Court, the core issue is: Was there a majority of shareholders vote to approve the amendment regarding the

Exhibit 8
Page 32 of 53

election?  Yes.  They did.  It's the exact same majority.

And, by the way, it's not just Innovativ.  Seven, eight, nine shareholders, they constitute that majority.  Innovativ is only one of many.  That is the exact same majority that Judge Kishner found to in fact be the majority shareholder group of this company.  That exact same group, following the Judgment by written consent, amended the bylaws, which Judge Kishner had already set authority to do it, validated other amendments.  Yes, you have a majority vote.  Yes, those amendments are valid.  Exact same process.  Exact same voting block.  Did it here because an election has not happened in, like, seven or eight years.  Beys is a quote/unquote:  Interim CEO.  He's rogue, off the reservation.

So, they enact that, and elect new directors, and then appoint new officers.  My view is that the status quo is that those newly elected directors and officers is who the correct directors and officers are to control the affairs of FTE.

The issues I think about -- you know, Judge Kishner already denied the stay.  The Nevada Supreme Court temporarily denied it before that.  Yes, is there briefing up there?  Yes, there are.

But one thing that's been of contention to some extent is those declaratory determinations can't really be

Exhibit 8
Page 33 of 53

stayed.  I mean, they are valid and existing.  You can't

stay them in the sense that somehow staying them makes them

ineffective.  Those actions occurred, she validated them,

they are what they are.

Our position has really only been the monetary

aspect of the judgment could potentially be stayed, but not

the declaratory relief aspects.  So, I think that all these

things on the periphery are just that.  They're smoke.

They are things on the periphery.  They aren't good reasons

to change -- to deny this Motion or somehow cast doubt

about what the status quo is.

These shareholders have waited years, and did so

cautiously, to ensure that they had a majority, that they

had a judge validate the majority, they could take the

actions that they had taken.  The shareholders at the end

of the day control the company, not officers.  Officers are

elected by shareholders and by a Board.  And these

shareholders who are the majority want to get proper

governance in place, want to get good actors in place, want

to figure out what's going on with this company.

By the way, when we were looking, I looked at my

notes quickly, there's approximately 25 subsidiaries for

this company.  So, these four are really a minority aspect

to what else is out there.

So, my view is that that's what the status quo is.

Exhibit 8
Page 34 of 53

1    And I think that's what's got to be decided today.  I think

2    there's got to be a restraining order restraining the

3    former officers and directors from acting on behalf of FTE,

4    allowing the newly elected Board to move forward and have

5    control and authority of the company moving forward.

6            I realize there could be issues to vet out.  You

7    know, there could be some overreach on the TRO.  I realize

8    there's some issues with the bankruptcy and whatnot.  But

9    we've got to get relief on this core issue.  And I do think

10   there's public confusion out there.  I think groups in the

11   bankruptcies or otherwise are unsure as to who really has

12   authority to act on behalf of this company.  And I got to

13   get that solidified so that the company can do what it

14   needs to do, and operate, and move forward.

15           THE COURT:  Okay.  Mr. Walther?

16           MR. WALTHER:  Yeah.  I'll be brief.

17           And, just on behalf of the company, this issue of

18   status quo and control, honestly, Your Honor, I don't think

19   it could be anymore straightforward and simple.  You have a

20   93-page Findings of Fact confirming that this group is the

21   majority, that has the ability to amend bylaws.  That exact

22   same group amends the bylaws to allow this vote.  The exact

23   same group, a majority, confirmed majority shareholders,

24   then elected this Board of Directors.  It's really that

25   simple, Your Honor.  They're appealing the Judge Kishner

Exhibit 8
Page 35 of 53

decision. Like you noted, there's no stay.

And to your question on if there was a status quo order entered by Your Honor and then down the road there's some stay order by the Supreme Court, I wouldn't be too concerned about that. Obviously, we're biased. But, you know, having read the briefs, I'm not sure that there's a very high likelihood of that being granted. But, even if it was, I think the defendants could come to this Court then and say we need to modify or, you know, vacate that TRO.

But relief here is needed, Your Honor. And Mr. Clement touched on this. And this is paragraphs 92 through 121 of the FFCL. Judge Kishner determined that this group of minority shareholders, the Beys Group, acted in such bad faith over numerous years to disenfranchise this majority group of shareholders that she took what I think is an extraordinary step of imposing over a million and a half dollars in special damages against them.

They have a history of acting in bad faith, of refusing to give up control of this company or provide enough information to the extent they're, you know, doing bad things with the assets of this company. And that bad faith is continuing even after Judge Kishner issued this ruling. I mean, they're making -- taking action on behalf of the company and essentially just completely disregarding

36

Exhibit 8
Page 36 of 53

1  Judge Kishner's ruling as if it doesn't exist.

2         But, to your question on status quo, I think there

3  cannot be any question based on Judge Kishner's ruling and

4  actions taken by the confirmed majority after that ruling

5  that the status quo is this current Board of Directors that

6  were duly elected by the confirmed majority of

7  shareholders.  And, given the conduct by this minority

8  group, I think it's appropriate to issue at least some form

9  of injunctive relief that we're requesting here.

10         THE COURT:  Okay.  All right.  Thank you,

11  everyone.

12         I am granting the Application in part and denying

13  the Application in part.  And this is just with regard to

14  the TRO.  We're going to have a further hearing on the

15  preliminary injunction.  I am granting the Application to

16  this extent.  And I'll ask Mr. Clement and Mr. Walther to

17  revise the TRO to be more eloquent than the way I'm saying

18  it.

19         What this Court has right now is is that it has a

20  valid Judgment from DC 31.  Okay?  That declares the First

21  Amendment valid, the Second Amendment valid, the Third

22  Amendment invalid.  As of today's hearing, the status of

23  that Order is being disputed insofar as the -- Mr. Beys and

24  his group of stockholders or his group of former officers

25  and directors are asking for a stay of those declarations

Exhibit 8
Page 37 of 53

from the Nevada Supreme Court.

This Court passes no really comment on finding on whether or not declaratory judgment can be stayed. That is something -- that is an issue that may be in front of the Nevada Supreme Court and that is something for the Nevada Supreme Court to decide on the Motion pending before it.

Instead, this Court reiterates that what it has is it has a presumptively valid declaration at the moment from DC 31. Based on those -- that presumptive --

[Audio/visual briefly dropped from Zoom]

[Colloquy between Court Staff]

THE COURT: -- submitted, and evidence submitted in support of the TRO Application, the Court has no disputed issue of fact --

[Audio/visual briefly dropped from Zoom]

[Colloquy between Court Staff]

THE COURT: Okay. Good.

So, what I was saying is, is that there were actions under -- undisputed actions undertaken, based on the validity of those declarations. The actions undertaken displaced Mr. Beys and his group as officers and directors and put into place new officers and directors. And, so, as of this moment, that is the status quo the Court has.

Accordingly, the Court does issue a TRO to maintain that status quo and prohibits the former officers

Exhibit 8
Page 38 of 53

```
 1   --

 2              [Audio/visual briefly dropped from Zoom]

 3                 [Colloquy between Court Staff]

 4        THE COURT:  -- the -- and I'm going to get to the

 5   bond in a moment, by the way.  I do --

 6              [Audio/visual briefly dropped from Zoom]

 7                 [Colloquy between Court Staff]

 8        THE COURT:  -- declaration.  DC 31's declaratory

 9   judgment that it has in front of it, as well as the

10   evidence supported -- and the evidence submitted in support

11   of the TRO that it has in front of it, that there is a

12   likelihood of success on the merits.

13        And, again, this Court does not -- I want to be

14   clear, I am not looking into the wisdom of DC 31's

15   decision, nor can this Court look into the wisdom of DC

16   31's decision, or any decision any other Court has made, as

17   it would constitute a collateral attack on other Judgments.

18   This Court merely takes the Judgment at face value and, in

19   doing so, finds the likelihood of success on the merits.

20        The Court also finds that there would be

21   irreparable harm absent an injunction --

22              [Audio/visual briefly dropped from Zoom]

23                 [Colloquy between Court Staff]

24        THE COURT:  In addition to that, the Court finds

25   that a balancing of hardships in the public interest weigh
```

Exhibit 8
Page 39 of 53

1    in favor of granting the TRO as well.

2          With regard to the public interest, there has to

3    be some stability of leadership as these matters are worked

4    out.  And, given the status of the DC 31 Judgment, and

5    given that it has not been stayed, the public interest in

6    the balancing of harms weighs in favor of maintaining the

7    status quo in favor of the Innovativ Group.

8          With regard to the books and records, the Court is

9    going to order a turnover of FTE Network's books and

10   records only.  To the extent there is a dispute that there

11   are no what the Court will call pure FTE books and records,

12   that will have to be raised at a later time.

13         But the Court does expect that the defendants in

14   good faith will turn over what are books and records of FTE

15   network solely and not utilize the issue of the bankruptcy

16   as a defensive maneuver or a defensive mechanism to create

17   or to manufacture a dispute as to this issue.  If a dispute

18   is manufactured, there are remedies that this Court can

19   employ in the future with regard to a violation of its TRO.

20         With regard to the books and records of the

21   subsidiaries and bankruptcy, or other subsidiaries, because

22   this Court is not aware -- well, with regard to the four

23   subsidiaries that are in bankruptcy, the Court expressly

24   finds that the automatic stay applies to any efforts to

25   take an action, to control, obtain the property of those

40

Exhibit 8
Page 40 of 53

subsidiaries.  That's very express in 42 U.S.C. 362.
Accordingly, the Court, by this order, is intending no
action be taken with regard to the subsidiaries, as well as
any of its books and records.

With regard to the possible other subsidiaries,
including at least one additional subsidiary called U.S.
Home Rentals, LLC, which appears to be the managing member
of Kaja Holdings 2, the Court also takes no action simply
because it's not aware of the whole corporate structure of
all the subsidiaries, how that relates to the four
subsidiaries that are in bankruptcy, and the Court proceeds
-- intends to proceed cautiously.

What the Court would recommend is that the
Innovativ Group -- I mean, the Innovativ Group should
proceed as they see fit.  But the Court would recommend
that they obtain some type of lift stay order or
modification of the automatic stay from the set -- from the
Bankruptcy Court from the Southern District of New York so
that this Court has some guidance, or has some relief, or
comfort as to what it can proceed -- as to how it can
proceed with regard to the remainder of the Application for
the TRO.

So, I think that is the substantive ruling with
regard to the TRO.

With regard to the bond, I think the damages here

Exhibit 8
Page 41 of 53

1  would be the possible attorneys' fees that the defendants

2  would incur in having the TRO removed.  And, so, I'll take

3  proposals right now on what the bond should be because I do

4  intend to require a bond around those possible fees.

5          So, Mr. Wiley?

6          MR. WILEY:  Sorry about that, Your Honor.  I had

7  to unmute myself.

8          So, is Your Honor asking for what the prospective

9  fees would be just to remove the TRO if we had to modify or

10 go down that road?  Or are we --

11         THE COURT:  Basically, brief the preliminary

12 injunction.

13         MR. WILEY:  Well, the entirety of the preliminary

14 injunction, the hearings, matters related thereto, I think,

15 you know, that the ballpark is probably 25 to $30,000 in

16 attorneys' fees, understanding that I don't charge as much

17 as the other people on this Zoom call.  So, you're getting

18 a cut rate there.

19         THE COURT:  Okay.  Mr. Clement or Mr. Walther?

20         MR. CLEMENT:  Honestly, I mean, the 25 to 30 seems

21 reasonable, I guess, to take it all the way through.  I

22 mean, it's a little hard for me to understand what the

23 defense is going to be, since we haven't really had one

24 previewed or the likelihood of it.  But, I mean, it strikes

25 me as a fairly reasonable amount.  I -- yeah.  That's kind

42

Exhibit 8
Page 42 of 53

of my thought.  I don't know what Mr. Walther thinks, but --

THE COURT:  Okay.  Mr. Walther?

MR. WALTHER:  Yes.  I think 25, I think, would be reasonable, given the Court's inclination on what the damages would be.  I think 25 is reasonable.

THE COURT:  Okay.  All right.  Very good.

Then the Court will impose a -- I think you asked for 25 to 30, so I'll, in deference to Mr. Wiley, I will impose the upper limit, a $30,000 bond or cash security. The TRO is not effective until the bond or cash security is posted.

I'm sure counsel knows, but the Clerk's Office closes at 4 p.m. on whatever day I enter the TRO.  The Clerk's Office requires the TRO to be entered before it will take the bond or cash security, and it will take a firm check for the bond or cash security, but it will not actually take cash.  So, just FYI so there are no issues there.

I would ask that you prepare the TRO in haste. Please run it by Mr. Wiley.  How long do you think it will -- Mr. Walther or Mr. Clement, how long do you think it will take you to revise the TRO and get it over to Mr. Wiley?

MR. WALTHER:  I mean, I think we can revise it

43

Exhibit 8
Page 43 of 53

today.  I don't know if Mr. Clement, you have a different
setup?

        MR. CLEMENT:  Yeah --

        MR. WALTHER:  I mean, it would be nice if we could
get the transcript just to ensure that we got all of the
findings that the Court made.  But if we can -- I don't
know --

        THE COURT:  I would get a JAVS and listen to it.
The transcript, even on 24 hours' notice, will take some
time.

        MR. WALTHER:  Yeah.  Certainly.  So, I mean, I
think today or tomorrow, I think we could get a revised TRO
that incorporates all the findings of the Court.

        THE COURT:  Okay.  So, this is what I'm going to
say.  I'm going to say please provide a revised TRO to Mr.
Wiley by 12 noon tomorrow.  I'll ask that the --and, by the
way, look at my department procedures on contested orders.
They are on my department website.  I require very specific
procedure to be employed.

        I would like the -- it needs to be returned within
24 hours by 12 noon the following day to plaintiffs'
counsel.  And, then, it's up to you, Mr. Walther and Mr.
Clement, after you receive it back after 12 noon what you -
- when you submit it to me, for me to resolve any contest.
Okay?

44

Exhibit 8
Page 44 of 53

1      And if you could please concurrently submit it to
2  the inbox, but also email it to me so that I know it's been
3  submitted to the inbox, since I'm not regularly on my
4  computer right now.  I'll log in as soon as I can, try to
5  resolve any contest and get your TRO entered, both so that
6  you can -- both so that you can file the bond, but also in
7  case there's any appeal taken from the Order, so that Mr.
8  Wiley's clients can take the -- take a timely appeal.
9          MR. WALTHER:  Understood.  Thank you.
10          THE COURT:  All right.
11          MR. CLEMENT:  One quick -- or just a
12  clarification.
13          THE COURT:  Sure.
14          MR. CLEMENT:  Is the TRO for a certain time
15  duration?  Or is it pending the --
16          THE COURT:  It is.  I have to enter it in 14 day -
17  - I have to hold the -- that was my next thing.  I have to
18  hold a preliminary injunction within 14 days, unless the
19  parties agree otherwise on a time frame, a longer time
20  frame, or unless I find good cause.
21          So, presuming that the TRO goes in -- let's say
22  Wednesday, the 20 -- I have to hold a TRO hearing by the
23  22nd.  I'm sorry.  A PI hearing by the 22nd.  I apologize.
24  Which I can get you on, on the 22nd.  I can get you on.  I
25  have a criminal calendar that morning, but I could hear you

45

Exhibit 8
Page 45 of 53

at 11 o'clock or 11:30 following my criminal calendar.

MR. WILEY: Your Honor, I would -- in deference to your Clerks, this one could be a little bit lengthy. Maybe we should do it that afternoon so they're not hangry if we go over the lunch hour.

THE COURT: I would not mind that, except I am in my -- you know, some -- it's been deemed wise to have Business Court -- a couple of us Business Court Judges handle criminal. And the issue I face is that I am in my criminal trial stack right now. And, so, if I have a trial that day, which I won't know until the week prior, I -- unfortunately, I would have to then displace you for the criminal trial. So, I would suggest we proceed at 11 or 11:30. And if -- I appreciate that for my staff. I can always get relief staff, if needed.

MR. WILEY: Okay. Eleven o'clock on the 22nd works for me.

THE COURT: Okay. Does that work for you all, Mr. Clement and Mr. Walther?

MR. WALTHER: Yes.

THE COURT: All right. Please put that --

MR. CLEMENT: Yes.

THE COURT: Please put that in the Proposed Order. We're going to go ahead and enter it on the calendar. But just put it in the Proposed Order that I anticipate in

46

Exhibit 8
Page 46 of 53

1  entering the Order on the 8th.  And, so, we will have the

2  hearing on the 22nd.

3          MR. WILEY:  Your Honor, on behalf of defendants,

4  obviously, you know, our Opposition was more procedural

5  than it was substantive.  Can we get leave to amend to

6  provide substantive argument based upon the Motion and --

7          THE COURT:  One hundred -- yes.  One hundred

8  percent.

9          And just to let everyone know, I expect -- it's

10 really Mr. Beys and his contingencies argument to raise in

11 an Opposition.  So, let's talk about that briefing

12 schedule.

13         But, to the extent, by the way, I'm violating the

14 automatic stay right now with regard to FTE, I expect that

15 to be raised.  But, to Mr. Clement's point, if I'm

16 violating it, then I guess Mr. Beys's contingency is also

17 violating it with regard to the case that's pending in

18 front of -- in Federal Court right now.  So, you know, we

19 can flesh that out if needed.

20         Mr. Wiley, when would you like your Supplemental

21 Opposition due so that I can get in a Supplemental Reply as

22 well?

23         MR. WILEY:  Let's see.  If we could get -- if we

24 can get the 15th, one week before?

25         THE COURT:  That would be okay with me.  And, I

Exhibit 8
Page 47 of 53

1  apologize.  I have to go get my charger.  But I can still
2  hear you all.

3          MR. WILEY:  Yeah.  Does that time --

4          THE COURT:  Mr. Clement, is that okay with you for
5  the 15th for the Supplemental Opposition?

6          MR. CLEMENT:  Yeah.  I guess that just depends.
7  When would I file my Reply?  How many days before the
8  hearing do you -- would you like it, Your Honor?

9          THE COURT:  If I could get it by 12 noon on the
10  21st, that would be fine with me.

11          MR. CLEMENT:  Okay.  That's fine with me.

12          THE COURT:  Okay.

13          MR. WILEY:  Not to be difficult, Your Honor, but
14  if we're doing -- I wanted to give plaintiffs enough of a
15  ramp up.  I didn't know that they would be able to file a
16  Reply the day of.  Can we get to the 17th then, just to make
17  sure that Mr. Cereghino gets back?  Or is that jamming you
18  up too much, Chad?

19          MR. CLEMENT:  Kind of feel like that jams me up a
20  little bit.  But --

21          MR. WALTHER:  Yeah.  Agreed.  I need --

22          THE COURT:  Well, if you all agree, we can push
23  the hearing out.  The 22nd is the date by the law.  And, so,
24  if you all, you know -- Mr. Wiley, if you all are able to
25  agree -- and maybe you want to wait for Mr. Cereghino.  I

48

Exhibit 8
Page 48 of 53

mean, what we could do is set the briefing schedule right now and if Mr. Cereghino and you are amenable to moving the hearing out another week, I mean, the TRO would remain in place until that time. That would give everybody some more breathing room.

So, do you want to put in this briefing schedule now then possibly meet and confer and submit a Stipulation and Order to kick out the hearing?

MR. WILEY: Yeah. Potentially. Let's go ahead and pencil it in for now. Yeah. Let's --

THE COURT: Okay.

MR. WILEY: If we -- my issue is, you know, Mr. Cereghino, again, has more institutional knowledge than I do, he doesn't come back until tomorrow. But, you know, he may be out of pocket a day or two trying to -- trying to recover with jetlag. So, I mean, if we get the 16th, that gives --

THE COURT: That doesn't give them very many days. So, I think I would keep it the 15th, your Opposition's due. That gives Mr. Clement, you know, three business days to put in -- three and a half business days to put in an Opposition. But, look, you can always seek to kick this out a little bit so everybody has a little bit more relief.

MR. WILEY: Well, that -- that's all depending on if Mr. Clement returns my phone call, unlike he did before.

Exhibit 8
Page 49 of 53

I'm just joking.

　　　　Yeah.  Let's do that.  Let's go -- let's pencil in the 15th, Reply the 21st.  And, then, if we need to, we'll reach out and see if we can -- if we need to bump it up, with the understanding that the parameters of the TRO will remain in place until we have that hearing.

　　　　THE COURT:  Okay.  All right.

　　　　MR. CLEMENT:  Jason, when I saw the minute order, I thought that kind of resolved it.  So, my bad.

　　　　MR. WILEY:  Well, and, you know, we are literally across the parking lot from each other.

　　　　MR. CLEMENT:  Right.

　　　　MR. WILEY:  So, don't throw a rock at my window and let me know that.  But it's all good.

　　　　MR. CLEMENT:  All right.

　　　　THE COURT:  All right.  Very good.  I'll see you all on the 22nd at 11 o'clock, unless I hear from you otherwise by way of Stipulation and Order.  Okay?

　　　　MR. CLEMENT:  One more quick thing, Your Honor. Non-evidentiary or evidentiary?

　　　　THE COURT:  As of right now, non-evidentiary --

　　　　MR. CLEMENT:  Okay.

　　　　THE COURT:  -- simply because I don't have an evidentiary dispute.  So, --

　　　　MR. CLEMENT:  Correct.  Okay.  All right.  I just

1  wanted to make sure.

2          THE COURT:  Yes.

3          MR. CLEMENT:  That was my mindset as well.  All

4  right.

5          THE COURT:  It could very well turn into an

6  evidentiary hearing on the 22nd.  And -- not on that day.

7  I'm not going to say suddenly bring up your witnesses.  But

8  I might say, hey, I have an evidentiary dispute now, I'm

9  going to -- that's good cause to extend the TRO, and I'm

10  going to schedule an evidentiary hearing.  And we'll talk

11  about it on the 22nd.

12          MR. CLEMENT:  Okay.  Understood.

13          THE COURT:  All right.  Great.

14          MR. WILEY:  Thank you, Your Honor.

15          THE COURT:  All right.  Thank you.

16          MR. WILEY:  Thank you for making time for us while

17  you're traveling.

18          THE COURT:  Of course.  Of course.  It's what I'm

19  here for.  Got to do it.  So, thank you all.

20          MR. WILEY:  Thank you, Your Honor.

21          THE COURT:  All right.

22          MR. CLEMENT:  Thank you.

23  ...

24  ...

25  ...

1      THE COURT:  All right.  Have a good day.

2      MR. CLEMENT:  You, too.

3      THE COURT:  Bye-bye.

4

5           PROCEEDING CONCLUDED AT 9:46 A.M.

6                  *   *   *   *   *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

## CERTIFICATION

2

3

4  I certify that the foregoing is a correct transcript from
   the audio-visual recording of the proceedings in the
5  above-entitled matter.

6

7

8  ## AFFIRMATION

9

10 I affirm that this transcript does not contain the social
   security or tax identification number of any person or
11 entity.

12

13

14

15

16

17

18

19

20  KRISTEN LUNKWITZ
    INDEPENDENT TRANSCRIBER
21

22

23

24

25