# EXHIBIT 10

2:25-cv-01927-ART-EJY

1                    UNITED STATES DISTRICT COURT

2                          DISTRICT OF NEVADA

3

4   FTE NETWORKS, INC.; THOMAS      )
    COLEMAN; JOSEPH CUNNINGHAM;     )  Case No. 2:25-cv-01927-ART-EJY
5   STEPHEN GOODWIN,                )
                                    )  Las Vegas, Nevada
6                   Plaintiffs,     )  Friday, October 24, 2025
                                    )  1:11 p.m.
7           vs.                     )
                                    )  MOTION HEARING
8   MICHAEL BEYS; RICHARD DE        )
    SILVA; MARIA FERNANDEZ;         )  *C E R T I F I E D   C O P Y*
9   ERNEST SCHEIDMANN; ANDREW       )
    SANCHEZ; DOES I-X,              )
10  inclusive; and ROE             )
    CORPORATIONS I-X,               )
11  inclusive,                      )
                                    )
12                  Defendants.     )
    _____

13

14

15              REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                THE HONORABLE ANNE R. TRAUM,
                  UNITED STATES DISTRICT JUDGE

17

18

19  APPEARANCES:        See next page

20

21

22  COURT REPORTER:     Patricia L. Ganci, RMR, CRR
                        United States District Court
23                      333 Las Vegas Boulevard South, Room 1334
                        Las Vegas, Nevada  89101
24

25  Proceedings reported by machine shorthand, transcript produced
    by computer-aided transcription.

```
                         2:25-cv-01927-ART-EJY
```

 1  APPEARANCES:

 2  For Plaintiffs Thomas Coleman, Joseph Cunningham, and Stephen
    Goodwin:

 3
            **CHAD F. CLEMENT, ESQ.**
 4          **NICHOLAS ADAMS, ESQ.**
            **ALEXANDER K. CALAWAY, ESQ.**
 5          MARQUIS AURBACH COFFING
            10001 Park Run Drive
 6          Las Vegas, Nevada 89145
            (702) 207-6092
 7
    For Plaintiff FTE Networks, Inc.:
 8
            **ERIC D. WALTHER, ESQ.**
 9          **ASHLEY SCHOBERT, ESQ.**
            BROWNSTEIN HYATT FARBER SCHRECK, LLP
10          100 North City Parkway, Suite 1600
            Las Vegas, Nevada 89106
11          (702) 382-2101

12  For Defendants:

13          **JASON M. WILEY, ESQ.**
            WILEY PETERSEN
14          10000 W. Charleston Boulevard, Suite 230
            Las Vegas, Nevada 89135
15          (702) 910-3329

16          **DANIEL STEPHEN CEREGHINO, ESQ.**
            LEX DOMUS LAW, LLC
17          1712 Tesara Vista Place
            Las Vegas, Nevada 89128
18          (702) 533-466

19

20

21

22

23

24

25

```

1          LAS VEGAS, NEVADA; FRIDAY, OCTOBER 24, 2025; 1:11 P.M.

2                                --oOo--

3                    P R O C E E D I N G S

4          COURTROOM ADMINISTRATOR:  Please rise.  The United

5    States District Court District of Nevada is now in session.  The

6    Honorable Anne Traum presiding.

7          THE COURT:  Good afternoon.  Please be seated.

8          MR. WILEY:  Good afternoon, Your Honor.

9          COURTROOM ADMINISTRATOR:  This is the date and time set

10   for emergency motions.  Calling Case Number

11   2:25-cv-1927-ART-EJY, FTE Networks, Inc., et al., versus Michael

12   Beys, et al.  Counsel, please state your appearances for the

13   record.

14         MR. CLEMENT:  Good afternoon, Your Honor.  Chad

15   Clement, Nicholas Adams, and Alex Calaway from Marquis Aurbach

16   on behalf of the plaintiffs:  Thomas Coleman, Joseph Cunningham,

17   and Stephen Goodwin.

18         MR. WALTHER:  And good afternoon, Your Honor.  Eric

19   Walther and Ashley Schobert from Brownstein on behalf of FTE

20   Networks, Inc.

21         THE COURT:  Okay.  And, I'm sorry, the gentleman who

22   spoke first, you're Mr. Clement?

23         MR. CLEMENT:  Yes.

24         THE COURT:  Okay.  Perfect.  Thank you.

25         Okay.  Very good.  Good afternoon to all of you.

1      MR. WILEY:  Good afternoon, Your Honor.  Jason Wiley of

2   the law firm, Wiley Petersen, on behalf of defendants.  My

3   cocounsel, Daniel Cereghino, will likely show up as well.  He's

4   in a settlement conference in State Court.  So if he sneaks in,

5   I just wanted to make sure that his appearance gets noted.

6      THE COURT:  Okay.  Very good.  Understood.

7      Okay.  So I realize that lots of stuff is getting filed

8   in this case.  The focus here today is the emergency motion to

9   remand and the emergency TRO.  So those are both plaintiffs'

10  motions.  The remand is ECF Number 5.  The TRO is ECF Number 6.

11  So I want to focus on those.  Because they're plaintiffs'

12  motions, I'll hear from plaintiffs first and then give

13  defendants an opportunity to respond, and then the plaintiffs

14  can have the last word.

15     So I just want to start with some preliminary remarks.

16  I have great respect for Judge Gall because I think I'm sorting

17  through many of the same issues, and I'm not sure that I have

18  really a fuller picture of what's going on.  But let me just

19  share some remarks.  I think it will give us some direction so

20  that you understand what I'm thinking and can address that.  And

21  then -- so, first of all, on the motion to remand, it seems to

22  me that this is related to bankruptcy.  That, sort of, two

23  things that are driving me is that the causes of action seem to

24  relate to the bankruptcy within the meaning of 1334.  And it's

25  even likely that they're preempted by the Bankruptcy Code, which

1   is also, sort of, a basis for removal jurisdiction.

2          And the reason that I'm thinking that is just looking

3   back at the complaint it really does seem that FTE is saying to

4   defendants, "Do not act on" -- I mean, obviously this is a

5   whole -- the whole thing is about corporate control -- a fight

6   about corporate control.  But FTE seems to be saying against the

7   defendant group, "Do not act on our behalf on behalf of FTE.  Do

8   not act on behalf of the subsidiaries."  And the relief -- the

9   prayer for relief seems to be explicitly for -- to stop the

10  defendants from acting or binding FTE or its subsidiaries and to

11  stop the defendants from initiating or continuing any bankruptcy

12  or insolvency proceeding for FTE or its subsidiaries.

13         So that just seems to me all wrapped up in the

14  bankruptcy issue and the -- while the whole case is about, sort

15  of, defendants acting -- trying to stop defendants acting on

16  behalf of FTE, the main example of that and the main thing to be

17  stopped, it seems -- focus -- is the bankruptcy.  And then of

18  course there's also, like, the books and those -- and property.

19         So those are my impressions.  And of course I can say

20  more, and I'm happy to hear more from you to hear your reactions

21  to that so we can address that.

22         And then I think, like Judge Gall, as we move into the

23  TRO issue, it seems to me that two issues are concerning to me.

24  One is what is the scope of the automatic stay in the Bankruptcy

25  Court.  I understand Judge Gall was very concerned about running

—2:25-cv-01927-ART-EJY—

1   afoul of an automatic stay, and so she tailored her TRO with

2   that in mind to make it very limited, focussed on FTE, and not

3   more.

4         And then -- so what is the, sort of, scope of the

5   automatic stay and how does that apply here?  What is the

6   scope -- relatedly, maybe the other side of the coin, what is

7   the scope of the TRO?  And then I think I'm going to be wanting

8   to know even -- so is this case subject to an automatic stay?  I

9   think I'm going to need more information on that to understand

10  that issue.  And even if it's not an automatic stay, there might

11  be an option for a stay like a *Landis*-style stay that is just

12  based on judicial efficiency, but that has some -- I may also

13  need more analysis on that.

14        So that's, sort of, one of the things I want to touch

15  on as we talk about the TRO.  I understand that, you know, under

16  28 U.S.C. 1450 that I can continue what the State Court did on

17  the TRO, but I think the State Court understandably was treading

18  very carefully to get it right and I -- and was working at an

19  absence of facts.  And I think that even if I continue the TRO,

20  I want to get the facts so that I'm getting it right about

21  whatever that long-term solution is.  So I want the parties to

22  weigh in on that.

23        And then it's not before me, but I think there's also a

24  question that defendants reserve the right to seek a transfer.

25  I don't think that's in front of me.  I'm kind of curious to

```
———————2:25-cv-01927-ART-EJY———————
```

1   hear if there's anything more -- if that's the direction.  So

2   with that, why don't we begin with plaintiffs.

3            MR. CLEMENT:  May I approach the podium, Your Honor?

4            THE COURT:  Yes, please.  I prefer that.

5            MR. CLEMENT:  We -- what do time limitations look like?

6   I always want to be respectful of the Court's time.  I don't

7   know if --

8            THE COURT:  Yes, I understand.

9            MR. CLEMENT:  -- there are other hearings.

10           THE COURT:  My hope is that we could do this, you know,

11  within an hour.

12           MR. CLEMENT:  Okay.

13           THE COURT:  So maybe 15 to 20 minutes and then we'll go

14  back and forth.

15           MR. CLEMENT:  Okay.  Let me just do a timer here real

16  quick so I know where I'm at.

17           Okay.  Well, I -- first of all, I want to thank the

18  Court for hearing these motions on an emergency basis.  I know

19  that's not convenient.  I know the Court has a docket and case

20  flow and emergency motions disrupt that.  But we felt that both

21  were warranted as emergency motions, and thank you for -- for

22  hearing it on that basis.

23           I guess I -- with your preliminary comments I probably

24  would like to just kind of jump into that issue of whether this

25  really is related to a bankruptcy or not.  Probably comes as no

1  surprise that from our standpoint it is not related to the

2  bankruptcy.

3          THE COURT:  That's not what your complaint says,

4  though.

5          MR. CLEMENT:  Well --

6          THE COURT:  Your complaint is all about stopping the

7  bankruptcy, and Judge Gall was asking in that -- in the State

8  Court hearing, you know, "Don't you have to fight this fight in

9  the bankruptcy?"  Like, "Am I going to tell the Bankruptcy judge

10 to dismiss a case?  Don't you have to move to dismiss the case

11 in the bankruptcy or use some other vehicle to shut" -- I mean,

12 if you don't want the bankruptcy to happen -- I don't know what

13 the corporate strategy is, but if you don't want the subsidiary

14 bankruptcies to happen, don't you have to stop them?

15         MR. CLEMENT:  All good and fair points.  My -- my

16 viewpoint is we are dealing with a much more fundamental issue.

17 I know the bankruptcies are referenced.  They were referenced

18 because at the time that was one of the events, amongst many,

19 that were occurring.  The fundamental issue is authority, that's

20 the fundamental issue, authority to commence the bankruptcy,

21 authority to do anything else related to the company, whatever

22 that may be, you know, run the business, pay bills, make

23 business decisions, things of that sort.  And those other things

24 were equally referenced in the complaint and also in the motion

25 for TRO and other things.

———2:25-cv-01927-ART-EJY———

1          So from my standpoint we're -- we are dealing with, to

2   the other point the Court, you know, noted, really a corporate

3   control dispute.

4          There was a majority shareholder vote that amended the

5   bylaws that allowed an election to occur by written consent.

6   That was done, completed, served upon the officers that purport

7   to be acting on behalf of FTE.  They were told to essentially

8   cease and desist, turn over the books and records, stop acting

9   on behalf of FTE.  Yes, the bankruptcy was one of those things.

10          (Mr. Cereghino enters the room.)

11          MR. CLEMENT:  And it had a particular kind of

12   heightened element as well because of the -- the other amendment

13   that had occurred to the bylaws that Judge Kishner had

14   confirmed.

15          Really, the bankruptcy was -- was not only an authority

16   issue, but also kind of an irreparable harm issue from our

17   standpoint.  We thought there was irreparable harm when we went

18   to Judge Gall to try to get the authority issue stabilized and

19   figured out.  And we're citing that as not only an unauthorized

20   act, but also the company as being irreparably harmed by --

21          THE COURT:  Yeah, because you're going to liquidate

22   major assets of the company.

23          MR. CLEMENT:  And --

24          THE COURT:  So I just don't understand how that's not

25   related to the bankruptcy.

2:25-cv-01927-ART-EJY

```
 1            MR. CLEMENT:  Well --

 2            THE COURT:  As, like, improperly -- this bankruptcy was

 3  improperly -- is improper, if you want to shut it down.

 4            MR. CLEMENT:  Right.

 5            THE COURT:  Right?

 6            MR. CLEMENT:  So --

 7            THE COURT:  Because it was initiated or is being

 8  continued by someone who lacks the authority to do that.

 9            MR. CLEMENT:  Right.

10            THE COURT:  And you said at the hearing in front of

11  Judge Gall, "I think we have to get involved in the bankruptcy.

12  We haven't.  I can tell that FTE hasn't done that, but the other

13  parent company has done it."

14            I, like Judge Gall, don't understand the corporate

15  structure, so I don't know what that means.  If you -- the

16  relationship with the subsidiaries, but...

17            MR. CLEMENT:  Right.  And so that gets to my more

18  fundamental point.  I would tend to agree that if the bankruptcy

19  needs to be dismissed or something needs to happen it needs to

20  happen over there, but who has the authority to do that?  And

21  that's -- that's my more fundamental point, which is really what

22  this case is about.  It's an election has occurred.  They

23  haven't quit office.  The individuals who are in office by way

24  of the majority shareholder vote can't really act because the

25  other former officers are purporting to act.  These officers
```

—2:25-cv-01927-ART-EJY—

1  don't have books and records.  They don't have access to

2  anything, and there's really no stabilization as to who has

3  authority to act.  And from my standpoint and our position that

4  is really what is at issue in this case.  And let me take this

5  one step deeper to the -- to the Court's comments.

6        Removal and the subject matter jurisdiction questions

7  are governed by the well-pleaded complaint rule.  And I know it

8  references the bankruptcy.  I credit that to the Court.

9        THE COURT:  It doesn't reference it.  It is all about

10  or at least half about the bankruptcy.

11        MR. CLEMENT:  Okay.  There's two claims, dec relief and

12  mandamus relief, both state statutes, both which fundamentally

13  ask to stop those officers from acting on behalf of FTE,

14  stabilize the corporate environment, and embody these officers

15  to act on behalf of FTE.  That's -- that's really what it's

16  about.

17        Now, let me -- let me take it just one step further, if

18  I can, because I thought about this.  The penultimate question

19  really is would you have to rely -- is our cause of action -- we

20  have to prove up an element of our cause of action in terms of

21  if this was a bench trial, a bench brief, a jury instruction,

22  something like that, would we really look to federal bankruptcy

23  law for us as plaintiffs to prevail on our claim?  I don't think

24  that we would.  From my standpoint to prevail on declaratory

25  relief and to prevail on mandamus relief, what we would have to

—2:25-cv-01927-ART-EJY—

1  prove up is:  Do we have a majority vote?  Was it properly

2  exercised under the amendments and under N.R.S. Chapter 78,

3  state law?  Was that vote duly and validly taken?  And is it

4  valid?

5      If the -- that is really from my standpoint what is at

6  the heart of the dec relief and the mandamus relief.  That's

7  what we would have to prove to win our case and, more

8  particularly, to win the claims that we pled.  So when --

9  when -- so from my standpoint -- and I really have not -- and,

10 remember, from my standpoint the case law says that the burden

11 to establish removal, the burden to establish subject matter

12 jurisdiction is not my burden, even though I'm the moving party.

13 It is the party who removed.

14     I have not seen an explanation, if we were to take a

15 spaceship in time to trial, what bankruptcy-wise would really

16 have to get construed and would really be at the center of a dec

17 relief claim and a mandamus claim.  There -- there really was no

18 explanation that I read as to what law would we actually have to

19 look at, what as a plaintiff would I have to prove.  I really

20 just kind of think -- from my standpoint I know the bankruptcy

21 was referenced, but I -- I don't think that that is the core of

22 the claims that we are dealing with.  I think it is one aspect

23 of an unauthorized act.  We referenced some other things, you

24 know, filing in another court and other things like that.  But

25 you could really chalk all of them up to ultra vires acts.

1           THE COURT:  Right.  But don't you think part of your

2   claim is ultra vires acts and your claim of irreparable harm

3   particularly?  Because I'm not sure that I've seen anything else

4   that's really urgent in terms of irreparable harm.  There are

5   some factual issues based on what defendant is saying about what

6   you have access to in terms of the company, but it does seem --

7   like in your prayer for relief initiating or continuing any

8   bankruptcy or insolvency, that seems to be either suggesting

9   that the bankruptcy was wrongfully filed or is -- or should --

10  or should at this point or after July 15 should have been

11  voluntarily dismissed, if that was an option, or something, in

12  order to substitute you in and allow the other FTE group, the

13  non-Beys, you know, your group, to run that show.

14          That seems to be what you're asking for as your relief

15  in your complaint.

16          MR. CLEMENT:  Yeah, well --

17          THE COURT:  And you haven't amended the complaint.  And

18  I know -- I mean, what's interesting to me is I know from this

19  case that you know how to file emergency motions to get what you

20  want.  I don't understand and I'm curious, like, why you aren't

21  jumping and screaming to the bankruptcy judge, "Time out.  Hold

22  on.  This is, like, illegitimate action that shouldn't be in

23  front of you."

24          MR. CLEMENT:  I -- I think it's because we saw the --

25  to the point I -- I made earlier, we saw the -- stabilizing the

─────2:25-cv-01927-ART-EJY─────

1    authority and getting the authority question decided judicially

2    first was the more prudent -- more prudent cause of action.  And

3    to, kind of, the point I was --

4            THE COURT:  But while you're doing that, the Bankruptcy

5    Court might give away, liquidate, your subsidiaries.  Because if

6    I were to grant even a TRO -- I mean, the bankruptcy ship is

7    sailing.  You haven't asked me to stop it.  I don't even know if

8    I can --

9            MR. CLEMENT:  Right.

10           THE COURT:  -- right?  So -- so we might -- you might

11    be parking this case with some protection here.  The TRO that

12    you have from Judge Gall does not protect the subsidiaries which

13    will be liquidated in the Bankruptcy Court.

14           MR. CLEMENT:  I do understand that and I think,

15    perhaps, it was a pleading mistake on our part.  You're reading

16    this as strongly -- us being strongly concerned about the

17    bankruptcy.  We are, but there are many other issues we are

18    concerned about.  I -- we don't know what's happening with the

19    company.  We don't know what kind of decisions are being made.

20    I have three individuals who have been elected officers and

21    directors who have fiduciary obligations who can't meet them

22    because they don't have books and records, because they don't

23    have a court authority -- court order saying that they do have

24    authority and that the others don't.

25           And, you know, dealing with third parties -- I mean, I

───2:25-cv-01927-ART-EJY───

 1  think we even referenced in the TRO things.  I mean, for

 2  example, with the Nevada Secretary of State, both sides have

 3  changed who the officers and directors are.  Okay.

 4      So bringing it back, are we concerned about the

 5  bankruptcy?  Yes, but from a more fundamental standpoint of

 6  authority, but we are concerned about many other things.  And,

 7  you know, Judge Gall, one of her rulings was there's got to be

 8  some stabilization.  We need to be able to tell outside third

 9  parties who they should be dealing with, who has authority, who

10  are proper officers and directors.

11      And that is -- that is our core concern.  You know, the

12  bankruptcy is one of them.  And if I could just make a comment,

13  I do realize that my prayer for relief references the bankruptcy

14  and insolvency.  The dec relief -- the actual claim for relief

15  as pled does not --

16      THE COURT:  You're talking about the -- I think you're

17  talking about, like, the well-pleaded complaint rule and the,

18  sort of, standard rules about, like, arising under jurisdiction.

19  But I understand -- my understanding, I could be wrong, from a

20  case like *In re: Fietz* in the Ninth Circuit is that the -- that

21  the bankruptcy jurisdiction -- the "related to" is quite broad.

22  That if the -- I mean, my understanding of the test is that if

23  the civil proceeding could conceivably have an effect on the

24  estate being administered in the bankruptcy, it is related to

25  the bankruptcy for jurisdictional purposes.

1          So that's a -- that's -- and that the -- that the

2     bankruptcy preemption is -- is also broad in that, you know, the

3     bankruptcy -- that -- that can, sort of, preempt state tort

4     causes of action that are related to and kind of similar in

5     flavor to what's going on or what's alleged here, is that

6     there's been, like, a wrongful bankruptcy or a wrongful use of

7     the bankruptcy, that that's at issue in the claims that are in

8     front of the Court, and that that also is considered preempted

9     by the bankruptcy.  And as Judge Gall said, that's a fight you

10    have to fight in the Bankruptcy Court if that is about them

11    doing something wrong.

12         So, to me, that is pretty broad.  And I understand that

13    you are framing your -- the relief that Judge Gall gave you as a

14    win.  I understand that, but she was also, like, really

15    tiptoeing around the relief that she was going to give for

16    precisely the same concern, that the bankruptcy automatic stay

17    is very broad.  And even though I think the Ninth Circuit law on

18    this is that the automatic stay does not touch non-debtors, so I

19    don't think on paper at least from what I understand of FTE

20    right now, which is very little, that it would touch FTE.  But

21    that was exactly where Judge Gall was trying to narrowly steer

22    her order.

23         MR. CLEMENT:  Yeah.  I -- I -- I thought Judge Gall

24    agreed more fundamentally with our position.  I -- I took her

25    ruling and comments to understand that the core issue was

—2:25-cv-01927-ART-EJY—

1   corporate control and authority.  I think she understood clearly

2   there was a bankruptcy and that that was going to -- you know,

3   we couldn't do anything with respect to that.  It was stayed.

4   And I -- and I actually agree with that.  I mean, I don't

5   disagree with that.

6           But I don't think because authority is at issue and

7   because it may have been unauthorized and because there may be a

8   stay that that transforms my core claim, which is about

9   authority, into a federal question.

10          THE COURT:  So I have a question about your -- this

11   lawsuit.  I guess I'm -- what is it that Judge Kishner's order

12   didn't resolve that you think needs to be addressed in this

13   lawsuit?

14          MR. CLEMENT:  What -- what it did -- what it did not

15   resolve, I don't think, is that the election took place after

16   Judge Kishner's judgment.  So in Judge Kishner's case there were

17   a number of disputes, but one of the core disputes was whether

18   the shareholders who exercised their votes actually constituted

19   a majority.  That was a core disputed issue.

20          You know, FTE's got all sorts of problems.  It hasn't

21   had an election in seven years.  The shareholders wanted to go

22   through Judge Kishner's case because of the dispute about the

23   majority vote and have a judicial declaration that they in fact

24   constituted the majority.

25          So once that occurred and came out, then this new

—2:25-cv-01927-ART-EJY—

1  amendment to allow the election by written consent if it hadn't

2  been done in two years.  Then subsequently that same majority

3  cast their votes to do a new election.

4          That wasn't -- that set of facts, other than who was

5  the majority, was not in front of Judge Kishner.  So from our

6  standpoint we needed to go back to court -- and the other

7  problem was that the vote wasn't being respected.  You know, it

8  happened.  There were four cease and desist letters over and

9  over over the course of about a month that said, "Hey, here are

10  -- here's the amendment.  Here's what -- here's what's occurred,

11  you know.  Quit office.  Cease and desist.  Turn things over."

12  And it wasn't respected.  I don't know how else to fix that

13  situation other than to go in, put it at issue, and get a

14  judicial declaration.

15          I want to just make one quick comment --

16          THE COURT:  Can I -- before you do that, can I just ask

17  you?

18          MR. CLEMENT:  Yeah.

19          THE COURT:  Do you -- so one of the things that Judge

20  Kish- -- she did a lot, but I'm trying to just hone in on one

21  issue.  I thought that she -- that the Second Amendment

22  particularly referred to filing a bankruptcy without process

23  requirements having been satisfied, the FTE.  So I guess one

24  related to that is did that apply to filing a bankruptcy on

25  behalf of a subsidiary and were those process protections

—2:25-cv-01927-ART-EJY—

1  satisfied before the bankruptcies were filed.

2         So irrespective of the change in control, were those

3  requirements complied with?

4         MR. CLEMENT:  So the amendment required a majority

5  shareholder approval for any liquidation event.  That was one of

6  the amendments confirmed by Judge Kishner.  We take the position

7  that the amendment was violated when the bankruptcies were

8  filed.  And they take the position that it only -- I think -- I

9  think -- I mean, I won't speak for them, but I think essentially

10  the position is that it didn't apply to subsidiaries.  It only

11  applied to FTE itself.

12         THE COURT:  Okay.  Okay.

13         MR. CLEMENT:  But I can tell you that a majority

14  shareholder vote was not sought and was not obtained, you know,

15  prior to a bankruptcy filing.

16         THE COURT:  Okay.  Thanks.

17         MR. CLEMENT:  I do -- I do want to just note one thing.

18  We are not seeking damages in this case.  Perhaps, you noted

19  that from the complaint.  We did not seek damages.  I view this

20  as strictly an equitable relief case, and that's why we didn't

21  plead damages.  We are not asking for tort or other forms of

22  damages for what might have been a wrongful bankruptcy filing.

23  We are not, or for really any other event.

24         We're really solely here in this case to get the

25  authority issue established, which is why we asked for dec

—2:25-cv-01927-ART-EJY—

1  relief.  Majority vote was taken.  These are the correct

2  officers.  Please stop acting on behalf of FTE because you're

3  not an officer or director anymore.  And then mandamus, turn

4  over the books and records.

5       Surely just equitable relief.  We seek no damages.  We

6  sought no damages in the complaint.  We seek no damages -- no

7  damages now.  That was very intentional on our part.

8       So I -- I don't know if I've talked the Court out of

9  the Court's position, but --

10       THE COURT:  Why is not seeking damages so important?

11       MR. CLEMENT:  Because it's not what the case is about.

12  The case is about -- all the clients want is a judicial

13  declaration that they are the true and correct officers.  We

14  really just don't -- it really -- I'm trying to kind of

15  reinforce that I -- that I mean what I say that the bankruptcy

16  was really just referenced as, you know, one of other acts that

17  was taken in an unauthorized way.  But we don't seek -- we don't

18  seek any kind of damages for -- for those events.  We -- we

19  really are here to get a judicial declaration.  And that's what

20  I was kind of trying to point out to the Court.

21       I know my prayer for relief says what it says, but if

22  you look at the dec relief portion, the actual first claim of

23  relief, we said, you know, "Pursuant to the declaratory judgment

24  act, we seek a judicial declaration, a declaration of the

25  parties's rights, obligations, and duties relating to

—2:25-cv-01927-ART-EJY—

1 defendants' lack of authority to act on behalf of FTE and FTE's

2 right to obtain possession of its corporate books and records in

3 the possession, custody, and control of the defendants."

4        And then we go on and we basically say, "Based on that,

5 we seek judicial declaration" -- that is in Paragraph 51 --

6 "that defendants have no authority, directly or indirectly, to

7 act for, bind, or represent FTE or its subsidiaries."  And, b,

8 that we're entitled to the possession of the corporate books and

9 records.

10        So it's really just, on that claim, settle the

11 authority issue.  And --

12        THE COURT:  Okay.

13        MR. CLEMENT:  -- we've got to have that settled because

14 we need it settled for the company's sake.  We need it settled

15 between the two sides.  And somebody has got to be cloaked with

16 judicial authority to be able to tell the Nevada Secretary of

17 State or other third parties or vendors --

18        THE COURT:  Or the bankruptcy judge.

19        MR. CLEMENT:  -- who you should be dealing with.

20        THE COURT:  But you are seeking -- so you filed a

21 motion for TRO.  Are you seeking a preliminary injunction?

22        MR. CLEMENT:  Yes.

23        THE COURT:  Do you have a motion for preliminary

24 injunction?

25        MR. CLEMENT:  We had -- yeah, we filed one in the State

————2:25-cv-01927-ART-EJY————

1  Court.  It was a motion for TRO and preliminary injunction

2  and --

3          THE COURT:  Oh, okay.  Did you --

4          MR. CLEMENT:  -- Judge Gall heard the TRO first and

5  then was setting a hearing on --

6          THE COURT:  Do you think you have a preliminary

7  injunction motion here?

8          MR. CLEMENT:  Well, I mean, my understanding is

9  everything -- I don't know.  Maybe I have to look if there's

10 something in the local rules, but I thought everything filed

11 originally kind of continues in force and effect --

12         THE COURT:  Oh, okay.

13         MR. CLEMENT:  -- under this court.  And so, yeah, we

14 had filed it and unfortunately weren't ever able to get it set

15 because of what happened with the removal, which is why we came

16 in on an emergency basis.

17         THE COURT:  So can you just tell -- just spend a moment

18 telling me about the urgency and threat of irreparable harm if

19 we disregard the bankruptcy.

20         MR. CLEMENT:  You know, Your Honor, I would be happy to

21 address it.  Mr. Walther is the one addressing that other

22 motion.  I don't know if that's something --

23         THE COURT:  Which other motion?  The TRO?

24         MR. CLEMENT:  Yes.

25         THE COURT:  Oh, okay.

─────2:25-cv-01927-ART-EJY─────

1          MR. CLEMENT:  Which is what I think irreparable harm

2    goes to.

3          THE COURT:  Okay.  I didn't understand that.  Okay.

4          MR. CLEMENT:  I mean, my ultimate answer to that in a

5    very simple sentence is that if we are correct that they're

6    without authority, everything is ultra vires.  And I think

7    authority is not a monetary thing.  It's a non-monetary --

8          THE COURT:  It's going to be a monetary thing when you

9    lose the subsidiaries in bankruptcy.  That to me just -- I mean,

10   maybe FTE is -- I don't know what your corporate strategy is.

11   Maybe you're cool with that.  You seem to be alleging that

12   that's a big deal.  You use the language "wrongful bankruptcy

13   filings."  So you seem to be distancing yourself from a wrongful

14   bankruptcy allegation.  I understand you have these very

15   specifically, more narrowly-framed declaratory mandamus relief

16   claims, but that does seem integral to your allegations.

17         MR. CLEMENT:  I think the bankruptcy is one aspect --

18         THE COURT:  Yeah.

19         MR. CLEMENT:  -- of irreparable harm.  I don't think

20   it's the only --

21         THE COURT:  Okay.

22         MR. CLEMENT:  -- and I think there are many.

23         THE COURT:  I'll hear from Mr. Walther about that.

24   Okay.

25         Thank you.

─────2:25-cv-01927-ART-EJY─────

1            MR. CLEMENT:  Yep.  Thank you, Your Honor.

2            MR. WALTHER:  Good afternoon, Your Honor.

3            THE COURT:  Good afternoon.

4            MR. WALTHER:  And I'd also like to thank you for

5   hearing us on an expedited basis here.  So I just -- for

6   context -- and I'm going to be as quick as possible and try --

7            THE COURT:  Yeah.

8            MR. WALTHER:  -- my best not to repeat what Mr. Clement

9   went over.  Just the sequence of events leading up to us filing

10  this case, Judge Kishner issues a judgment after a trial

11  confirming who the majority shareholders are.  That exact same

12  group of majority shareholders amend the bylaws to allow

13  director votes by written consent.  Exact same group of majority

14  shareholders elect in this new board.

15           The purposes of this new case is to get confirmation,

16  judicial confirmation, that that new board was duly elected for

17  FTE, the parent company that's not in bankruptcy, with the

18  authority to do anything for the company and -- and contrast

19  that the former officers and directors lack the authority to do

20  anything on behalf of the company.  And that's needed here -- we

21  tried to avoid it, but it's needed here because the former

22  officers and directors, despite Judge Kishner's ruling, despite

23  the events that took place after, are still taking the position

24  that they're the effective board and officers of this company.

25           So really the purpose of this lawsuit is to get a

—2:25-cv-01927-ART-EJY—

1  judicial declaration on a narrow issue, is this new board a

2  valid board with the authority to act on behalf of FTE, the

3  parent company.  And I think the reasons that the bankruptcies

4  were cited in there, they were just examples of one of many

5  things that the former officers and directors are doing in

6  violation of -- of the rights that the new board and the

7  shareholders who elected them have.  So really all we're trying

8  to do with this new action is get a declaration that this new

9  board is the board with the authority to act on behalf of the

10  company.

11       And I think you asked a really good question that did

12  come up with Judge Gall, why aren't you doing more in the

13  bankruptcy cases.  And I think the conclusion that was reached

14  is that if we go to the Bankruptcy Court and say, "We're in

15  charge of the parent company who's not a debtor," the other

16  side's going to come in and say, "No, we're actually in charge

17  of the parent company who's not a debtor."

18       And I think more likely than not the Bankruptcy Court

19  is going to say, "You need to get clarity.  It's a Nevada

20  company.  You're trying to enforce a Nevada judgment.  We need

21  clarity from the Nevada court on who's in charge of this parent

22  company."  I'm not sure that the Bankruptcy Court will be

23  inclined in a case where the debtors -- and they're too removed.

24  I mean, it's a subsidiary of a subsidiary -- is going to hold a

25  trial on whether the current duly-elected board of the parent

1  company was rightfully elected.

2          I think you made a good point that the automatic stay

3  is very broad.  I'm not sure that it would reach to prevent a

4  court in Nevada from determining whether the current board of a

5  parent company that's not a debtor was duly and properly elected

6  such that that board can do anything on behalf of the company,

7  including directing downstream subsidiaries into bankruptcy.

8          THE COURT:  I understand all of that, and it makes

9  perfect sense.  But not telling the bankruptcy judge any of that

10  doesn't make sense.

11          MR. WALTHER:  Totally understand, and I'll tell you

12  that --

13          THE COURT:  Which is -- because the bankruptcy judge is

14  a judge, too.  And the bankruptcy judge isn't going to want to

15  decide something that, you know, the bankruptcy doesn't need to

16  decide.  So it seems to me like you would be -- if you did

17  intervene, you would say, "Look, we are not a debtor or we are."

18  I don't know what your relationship to the subsidiaries are.

19          MR. WALTHER:  Sure.

20          THE COURT:  Same question Judge Gall asked you.  Do you

21  have an answer to that?

22          MR. WALTHER:  I do.  So a few things.  One of my

23  bankruptcy colleagues has been participating in the bankruptcy,

24  attended a creditors' meeting.  It's at the very early stages.

25          THE COURT:  Uh-huh.

2:25-cv-01927-ART-EJY

1          MR. WALTHER:  And we filed this case and sought

2  emergency relief in the State Court and obtained a first TRO.

3          THE COURT:  Okay.

4          MR. WALTHER:  And I can tell you without -- I don't

5  want to disclose any confidential information or anything like

6  that, but I'll tell you that once we have the comfort of a TRO

7  confirming that it's more likely than not that the current board

8  is the duly-elected board, that things are going to happen

9  quickly within the bankruptcy.  But there was a decision that

10  there needed to be some clarity from the State Court or from a

11  court in Nevada that's hearing this, kind of, upstream dispute

12  about who's in control of this company to get clarity there

13  before we can start doing things within the bankruptcy, which is

14  why we moved for expedited relief and ultimately obtained it

15  from Judge Gall.

16          THE COURT:  Okay.

17          What is the relationship between F- -- I don't

18  understand anything about the corporate structure -- the

19  relationship of FTE to these four companies, subsidiaries in

20  bankruptcy?  And then also I notice on the bankruptcy -- I'm

21  going to get -- U.S. Home Rental or something like that is

22  part -- is now in the bankruptcy.  That is a parent of one of

23  the subsidiaries.  Can you just fill me in a little bit on that?

24          MR. WALTHER:  Sure.  So my understanding -- and this

25  was -- and I'm sure you read the transcript with Judge Gall that

—2:25-cv-01927-ART-EJY—

 1  part of the issue we're having is that this new elected board
 2  and company counsel doesn't have a complete picture because the
 3  former officers and directors are refusing to provide any
 4  information that's in their possession.
 5       But my understanding is that FTE -- the Home Rentals is
 6  a subsidiary of FTE and that these bankrupt subsidiaries were
 7  subsidiaries of Home Rentals.  But, again, I'm -- with the
 8  caveat that the former officers and directors are actively
 9  withholding books and records such that we can actually confirm
10  that.  But that is our -- our understanding as things sit here
11  today.
12       And I'll say just quickly, you know, our claims were
13  brought under state -- state statutes.  Really, the case that
14  matters here is the *Grable* case.  Do you have to necessarily
15  resolve a federal question to resolve our case?  And the answer
16  has to be no here.  The question that's being answered in our
17  case is was this board, the current board, the plaintiffs in
18  this case, were they duly elected under Nevada corporate law and
19  the bylaws of this Nevada corporation.  That's it.  If the
20  answer's yes, then the former officers and directors cannot do
21  anything with regard to this parent.
22       And to answer that question, I don't think there's any
23  reason to have to dive into the nuances of bankruptcy law.
24       THE COURT:  Can you remind me if *Grable* is a bankruptcy
25  case or -- I don't think it is.

—2:25-cv-01927-ART-EJY—

1          MR. WALTHER:  It is...  I think it's a Third Circuit

2    case.

3          THE COURT:  I think it's a Supreme Court case.

4          MR. WALTHER:  Oh, sorry.  U.S. Supreme Court.  That

5    I'll say just for what it's worth, one of the most negatively

6    cited cases I've ever seen because the exception it made is so

7    narrow.  I mean, it's distinguished in almost every case where

8    it comes up because the rule created in *Grable* is so narrow and

9    you really have to necessarily resolve a predominant issue of

10   federal law for -- for the *Grable* to apply.

11         THE COURT:  I'm not sure that's the test in bankruptcy.

12   I think the sweep of bankruptcy in federal -- and bankruptcy

13   preemption is broader than that under *Miles* and *MSR* under Ninth

14   Circuit cases.

15         MR. WALTHER:  Okay.

16         THE COURT:  Okay.  So that's helpful for me.  Can you

17   just -- so you are going to address the TRO.  If we put aside

18   for the moment the bankruptcy, it's the books and records that

19   are the imminent harm that you're -- I mean, tell me --

20         MR. WALTHER:  Sure.

21         THE COURT:  -- more specifically.  Because, to me, I --

22   so when I look at the TRO factors, I mean, I think I have -- I

23   can rely on 1450 to just adopt what the State Court did.  My

24   concern about doing that is exactly what the State Court's

25   concern was, which is I'm carefully tiptoeing around bankruptcy

─────2:25-cv-01927-ART-EJY─────

1  issues and -- and that seems troubling for me.  So -- but -- but

2  just looking at the factors, it does seem like FTE has the upper

3  hand or the likelihood of success on the merits on the corporate

4  control issues, primarily on Judge Kishner's ruling, which I

5  respect and don't have to repeat or question.

6        And then the -- but I want to be concrete about the

7  threat of irreparable harm --

8        MR. WALTHER:  Sure.

9        THE COURT:  -- so that I understand that it actually is

10  imminent and that a TRO is necessary, and we can't just, sort

11  of, do this like a regular case.

12        MR. WALTHER:  No.  Understood.  And I'm happy to

13  address that.

14        THE COURT:  Okay.

15        MR. WALTHER:  So a few things.  I'll start with some

16  context then.  The same group of defendants in -- and I think

17  this is context and it's relevant to the TRO.  It came up in the

18  hearing with Judge Gall -- that after hearing all of the

19  evidence Judge Kishner felt it appropriate to do what I

20  considered to be the extraordinary step of awarding special

21  damages given the bad faith taken by this same group.  And just

22  knowing, kind of, what's happened in the past coming into this

23  case and the refusal to -- to provide any kind of information,

24  obviously we were concerned about the filing of the

25  bankruptcies.

1        But I guess the irreparable harm as I see it is, kind

2   of, two fold.  The books and records, as company counsel what

3   concerns me the most because in my experience when former

4   officers and directors are refusing to give any information

5   about what they've been doing with the company, especially with

6   the history of what we know has happened with this company, it

7   causes concern because usually that's a good indication that

8   things are moving out and being disposed of, and there's concern

9   there.

10       So the immediate risk here is we'd like a better

11  picture of what's happening with the finances of this company

12  given who we're dealing with.

13       And then on top of that, and we didn't really include

14  it in our briefing before this Court, but it was definitely in

15  the briefing below, just the usurpation of -- of authority from

16  the board and the -- depriving shareholders of their ability to

17  make decisions on behalf of the company, and all of that by --

18  by, you know, several decisions -- and we can pull those if

19  you'd like, but they're in the briefing before Judge Gall --

20  that in and of itself has been viewed as irreparable harm.

21       It's harm for which money damages can't compensate.

22  And that's ultimately what Judge Gall's finding was on the

23  irreparable harm piece that you have former officers and

24  directors who are preventing the rightful board from controlling

25  this company.

—2:25-cv-01927-ART-EJY—

1          So that, but as company counsel, I'll tell you that the

2    books and records is the most immediate concern here because

3    there -- we believe there could be, you know, issues with assets

4    and preserving and things like that.

5          THE COURT:  I felt like I read a representation by the

6    defendants that -- that you're wrong, that you have those books

7    and records or you have them for Innovativ or for something.

8    Can you just respond to that?

9          MR. WALTHER:  Yes, that is not true.

10          THE COURT:  Okay.

11          MR. WALTHER:  Yeah, we have -- we have none of the

12    books and records.  There were multiple demands made, including

13    a final one by myself and my office.  And we've received

14    nothing.

15          THE COURT:  Okay.

16          Anything else right now?

17          MR. WALTHER:  No.

18          THE COURT:  Okay.  Very good.

19          MR. WALTHER:  Thank you.

20          THE COURT:  I'll hear from defense.

21          And before we get started, Mr. Clement?  No.

22          MR. CEREGHINO:  Sorry.  Thank you for letting me enter

23    late.  I was --

24          THE COURT:  I understand.  No worries.

25          MR. CEREGHINO:  -- across the street.

2:25-cv-01927-ART-EJY

1          MR. WILEY:  Mr. Wiley.

2          THE COURT:  Mr. Wiley, yes.  Are both of you going to

3  speak or just one of you?

4          MR. WILEY:  Probably both of us.

5          THE COURT:  Okay.  On what and what?

6          MR. CEREGHINO:  I was going to do more TRO related.

7          THE COURT:  Okay.  So I just want to move quickly so

8  I'm clear about the time.

9          MR. WILEY:  Sure.

10         THE COURT:  Okay.  Go ahead.  So you're addressing

11 whether this is a bankruptcy issue.

12         MR. WILEY:  Pretty much the bankruptcy issue, Your

13 Honor, related to the motion to remand.  And, Your Honor, I

14 think -- I think you're correct with the preliminary remarks as

15 it relates to, you know, whether or not we've got a federal

16 issue here.  The complaint is littered with reference to the

17 bankruptcy.  And plaintiffs have couched defendants' efforts as

18 some sort of -- like we were sore losers after we left Judge

19 Gall's courtroom or Zoom call when we had the hearing on the

20 temporary restraining order.  That's not the case at all.

21         As Your Honor saw in the transcript, Judge Gall raised

22 all these issues as well and that just reaffirmed our position

23 as to why this Court, or potentially the Bankruptcy Court, is

24 the proper venue and can exercise jurisdiction based upon these

25 federal question issues that arose.

——2:25-cv-01927-ART-EJY——

1        As a little bit of a backstory of how we got to where

2  we were with respect to Judge Gall, the complaint in this action

3  and the ex parte application which were initially filed in State

4  Court were provided -- and I say "provided" because they were

5  not served -- they were provided to Mr. Cereghino and myself on

6  the morning of September 25th.  That was a Thursday.

7        Judge Kishner's order shortening time required that

8  service be effectuated by noon that day.  Service was never

9  effectuated.

10        Subsequent -- on any of the five defendants.

11        THE COURT:  Does this go to notice?  Like, whether

12  we're doing an issue -- I mean, you have notice now.

13        MR. WILEY:  No, no.  But what I was trying to get to

14  was the fact that these issues have never -- the issues of

15  bankruptcy, the issues of the federal questions that were set

16  forth in the complaint, those have never been substantially

17  addressed.  And the reason why is because in front of Judge Gall

18  our argument in response to the temporary restraining order was

19  purely procedural.  Plaintiffs didn't do what they were required

20  pursuant to the order, and as a result we shouldn't even move

21  forward with the temporary -- with the temporary restraining

22  order and let's just have this thing heard in its normal course.

23        And Mr. Cereghino will touch on it in greater detail,

24  but we've been asking plaintiffs from the get-go, what is the

25  emergency?  And I think Your Honor has kind of keyed into this

—2:25-cv-01927-ART-EJY—

1   as well.

2         And, you know, what you heard from both Mr. Walther and

3   Mr. Clement were all speculative.  There's the use of the word

4   "if" a lot.  There was, "Well, we didn't go to the Bankruptcy

5   Court because," and I wrote it down, "it's more likely than not

6   the Bankruptcy Court would say go get clarity from the Nevada

7   courts."  Well, that's speculative.  We -- we don't know that to

8   be the case.

9         So based upon, you know, all -- all the issues that

10  were raised in the complaint, were raised by Judge Gall, this is

11  the proper court to exercise jurisdiction over the issues,

12  notwithstanding the fact that we've got two other cases that

13  Your Honor knows about.

14        THE COURT:  Uh-hmm.

15        MR. WILEY:  They've been transferred to you.  These are

16  the -- these are all the same issues, the same questions.  These

17  are -- this just goes to show that both the allegations that are

18  alleged by the defendants, who are plaintiffs in those other

19  actions, as well as plaintiffs, they share a common nucleus of

20  operative fact.

21        So the fact of the matter is I believe that in

22  transferring these matters to you -- and we've got a motion to

23  consolidate to bring in Judge Mahan's prior litigation so we can

24  delve out and have all these issues addressed as it relates to

25  both dec relief actions alleged by plaintiffs as well as my

—2:25-cv-01927-ART-EJY—

1  clients in the other actions.

2       I think this -- this remand question is -- has been

3  satisfied by Your Honor, and there's been nothing that's been

4  provided by plaintiffs in response to your questions indicating

5  why.

6       THE COURT:  Okay.  Can I ask you -- I don't know which

7  of you is better situated to answer.  What do you know -- I

8  mean, what -- the plaintiff just referenced, sort of, a -- some

9  kind of participation of FTE in the bankruptcy as maybe not a

10 filer, but an observer or something.

11      MR. WILEY:  Right.

12      THE COURT:  Are you aware of that?

13      MR. WILEY:  I am aware of that.

14      THE COURT:  Do you have any perspective on whether

15 this -- what you know about the corporate structure if FTE

16 says -- if FTE is right about what it says in -- let's say FTE

17 is right on the merits that they are the people in charge,

18 right.  Do you know anything about the corporate structure in

19 terms of the bankruptcy that the automatic stay would reach FTE?

20      MR. WILEY:  Mr. Cereghino would be better suited --

21      THE COURT:  Okay.  That's fine.

22      MR. WILEY:  -- because --

23      THE COURT:  I just wanted --

24      MR. WILEY:  -- he's got more institutional knowledge

25 regarding the Delaware action and it -- I kind of chuckled a

2:25-cv-01927-ART-EJY

1  little bit when you talked about FTE because we're in this weird

2  situation where we represent FTE as well --

3          THE COURT:  Yes, I have FTE versus FTE --

4          MR. WILEY:  -- and they represent FTE.

5          THE COURT:  Got it.

6          MR. WILEY:  So when you say "FTE" and you're talking

7  about "they," in my head I'm like, "No, we're FTE."

8          But, no, Mr. Cereghino would be -- would be better

9  suited to delve into the issues regarding the Delaware action,

10 the subsidiaries, and all those matters that are related

11 thereto.

12          THE COURT:  Okay.  Very good.

13          MR. WILEY:  I think the remand issue has been

14 clarified.  I think that Your Honor was spot on with the

15 preliminary remarks.  I don't want to continue to come up here

16 and just regurgitate everything.  So unless Your Honor has any

17 questions regarding --

18          THE COURT:  No, I'm going to switch gears and, sort of,

19 hear more about the practical issues about next steps.

20          MR. WILEY:  And with respect to the temporary

21 restraining order, I'll defer to my colleague.

22          THE COURT:  Perfect.  Thank you.

23          MR. WILEY:  Thank you, Your Honor.

24          And, again, thank you for graciously granting our --

25 our request to move the hearing due to my inavailability [sic].

—2:25-cv-01927-ART-EJY—

 1          THE COURT:  Thank you.

 2          MR. CEREGHINO:  Good afternoon, Your Honor.  Dan

 3  Cereghino.

 4          So I guess I'll start --

 5          THE COURT:  I don't know if you were here during my

 6  preliminary remarks.

 7          MR. CEREGHINO:  I wasn't.  I was across the street in

 8  front of Judge --

 9          THE COURT:  So you're addressing the TRO.  Let me

10  repeat --

11          MR. CEREGHINO:  Sure.

12          THE COURT:  -- sort of, what I think is maybe the core

13  issue in terms of the TRO, is there seems to be, kind of,

14  connected issues of what is the scope of a TRO and what is the

15  scope of the reach of a bankruptcy stay, and if it's not -- I

16  mean, I think the Ninth Circuit basically has held, and there's

17  case law recognizing it, that an automatic stay in the

18  Bankruptcy Court doesn't extend to non-debtors.

19          So based on what little I know about what's going on,

20  FTE is not currently itself part of the bankruptcy and might not

21  be part of the automatic stay, but I don't actually know much

22  about FTE and its relationship with the subsidiaries.  So in the

23  world -- like, if I believe that FTE on the merits of their

24  lawsuit is 100 percent correct that they actually -- that this

25  group -- plaintiffs' group is the proper controlling authority,

1  like, if they're right about that, I'm trying to understand,

2  sort of, are we talking -- are we subject to the bankruptcy stay

3  or are we going to be -- should I be staying this while

4  something happens in the bankruptcy if we're not subject to a

5  stay?  There are other vehicles to get that kind of stay.

6          So -- yeah.  And, also, I guess a little bit of just

7  whether you think the TRO that Judge Gall issued with respect to

8  FTE only was proper.

9          MR. CEREGHINO:  I'm -- I'll -- sure.  I'll get to that

10  as well.  So unfortunately with respect to I think the first

11  piece, classic answer from attorneys, I think that could

12  probably use some additional briefing.

13          THE COURT:  Yes, I agree.

14          MR. CEREGHINO:  Because the structure -- I don't want

15  to say the word "complex," because that I think suggests

16  confusion.  It's just there's a lot of moving parts.  Okay.  And

17  so this is going --

18          THE COURT:  Are there more layers than subsidiary, U.S.

19  Home Rental, and FTE?

20          MR. CEREGHINO:  I'm not entirely sure and here's why.

21  And it does -- with a little leeway, it gets all the way back to

22  Judge Kishner and our issues on appeal with Judge Kishner, but

23  the point is FTE Networks has brought a transaction through this

24  gentleman who's now been convicted of fraud, Suneet Singal --

25          (Court reporter interruption and clarification.)

```
                      ─2:25-cv-01927-ART-EJY─
```

1          MR. CEREGHINO:  Suneet, S-U-N-E-E-T, Singal,

2    S-I-N-G-A-L, and he brought two gentlemen, father/son, Antoni

3    and Alex Szkaradek, S-Z-K-A-R-A-D-E-K, to FTE with a proposed

4    real estate transaction of 3,000 or so homes all across the

5    country.

6          Now -- okay.  So that transaction, which is called the

7    Vision Portfolio transaction, the second amended purchase

8    agreement, which is the controlling one, is -- I'm not a

9    transactional attorney so I don't really fully get it, but

10   there's dozens of subsidiaries -- of entities wrapped up --

11         THE COURT:  Okay.

12         MR. CEREGHINO:  -- into this thing.

13         THE COURT:  Okay.

14         MR. CEREGHINO:  How those were then subsequently

15   repackaged, put under parent -- Subparent A versus Subparent --

16   I don't know.

17         THE COURT:  But do you construe the allegations in the

18   complaint by plaintiffs to assert that plaintiffs seek to

19   control FTE and its subsidiaries?

20         MR. CEREGHINO:  Yes.

21         THE COURT:  Okay.

22         MR. CEREGHINO:  Absolutely.  Otherwise, they

23   wouldn't --

24         THE COURT:  Doesn't mean -- I mean, I know very little

25   about bankruptcy.  I don't think that makes them debtors.  I

———2:25-cv-01927-ART-EJY———

1  think that they have to actually be debtors in order to be

2  considered -- be in the web of the -- reached by the automatic

3  stay.  But --

4          MR. CEREGHINO:  So on that point is where I was

5  eventually going to get to, on, I don't have the financial

6  relationship of debt -- what that debtor down-the-chain

7  relationship.  I haven't looked at these bankruptcy filings.  I

8  would think they would know the answer off the top of their

9  head, but with most things in this case they say a lot without

10  providing support.  Okay.

11          But the bottom line is, you know, as we briefed, the

12  one thing I think we can all agree on is they are challenging

13  bankruptcy filings.  State law claims that challenge bankruptcy

14  filings are preempted.  That's the *Gonzales* case.  We certainly

15  shouldn't allow proceedings to go forward in State Court and

16  then oopsie, oopsie, we realize something went wrong, especially

17  not when we have other matters -- because bankruptcy, by the

18  way, is not the only federal question issue.  They also slip in

19  8-Ks in there.  So those are securities law questions.

20          THE COURT:  Right, that's not what I'm focussed on.

21          MR. CEREGHINO:  Right.

22          THE COURT:  I understand your position on that.

23          MR. CEREGHINO:  So it's not just bankruptcy that's

24  driving the removal.  I mean, they mentioned it a lot so it got

25  a lot of attention, but it's not the only issue.

—2:25-cv-01927-ART-EJY—

1          Neither is 8-K the only other issue.  You've heard them

2    talk a lot about ignoring Judge Kishner and despite Judge

3    Kishner.  Well, as we briefed, there was an earlier-in-time from

4    Judge Mahan.

5          THE COURT:  No, I -- I understand that, yeah.

6          MR. CEREGHINO:  So -- fine.  But in terms of that

7    specific question, though, I -- I don't know specifically right

8    now what that relationship between FTE and those different

9    entities is as a specific debtor, but I know the general rule

10   which is state law claims that challenge are preempted.  And in

11   the total universe that we are operating in, it belongs here for

12   judicial economy, for decisional integrity, for all those --

13   inconsistency, because they're bringing up other issues, it

14   belongs here.

15         THE COURT:  Defendants in their -- I think it was in

16   your removal papers, if I'm not mistaken, you reserved the right

17   to seek a transfer.  I just wanted to hear a little bit about

18   whether that's something you're seeking to do.

19         MR. CEREGHINO:  That -- look, to be frank, at this

20   point that was an abundance of caution.  Hasn't fully been

21   explored yet.  We think --

22         THE COURT:  That's fine.

23         MR. CEREGHINO:  -- just at first blush that could make

24   sense.  But, again, this case actually has federal fingers in

25   Nevada, in New York, in Delaware, in wherever these bankruptcies

 1  were initiated.  So there are still questions to work out about

 2  that.

 3          THE COURT:  I understood your -- somewhere in your

 4  papers I understood you to be, and I just mentioned this to

 5  plaintiffs, claiming that the books and records thing is or

 6  books and records, whatever, and property is -- that there

 7  actually is no -- that they have them, that -- so can you just

 8  address that?  Because I want to understand that.

 9          MR. CEREGHINO:  I'll say I believe the statement was,

10  because they make as part of this books and records generality,

11  shareholder list, whatever, they have those.  They have the

12  shareholder list.  That's exactly what was litigated in front of

13  Judge Kishner.  Other books and records, though, I suppose they

14  don't have.  They haven't exactly explained, I don't think, what

15  the need is for them.

16          So, again, during the meet and confer, we asked what is

17  the need.  If there is an imminent deadline, if there is a

18  certain proposal, or if there is something that you think is

19  before, let us know and we can maybe come up with some sort of

20  resolution in the interim here.

21          There was no answer.  It was just "we don't know what's

22  happening."  Like, okay.  Well...

23          But what they do know, because, again, it's littered

24  throughout the prior case in front of Judge Mahan in the

25  2:22-1184 case; in the case before -- originally before Silva

1  before it was consolidated before Judge Mahan, that's 2:22-1362;

2  in the Kishner case.  They know that this company is effectively

3  not doing business much.  It's doing very little what we would

4  call business, and most of its business is actually attempting

5  to pursue claims against auditors and other people who assisted

6  in an embezzlement scheme by the former management team, nothing

7  to do with Mr. Beys, nothing to do with Mr. De Silva, nothing to

8  do with any of the defendants here.  Those people are in jail or

9  had their -- their issues.  But we are pursuing monetary relief

10  claims.  That is really the focus of the company.

11        So you don't need, I don't believe, formal books and

12  records to confirm that there's nothing.  There's nothing there

13  there.

14        THE COURT:  You're basically saying that FTE isn't

15  conducting business?

16        MR. CEREGHINO:  It's -- it's doing very little.

17  It's -- the business it was getting into was to buy these homes

18  and manage those homes.  Because of the consumer fraud

19  perpetrated by the Szkaradeks, the Pennsylvania AG, City of

20  Chicago, Wisconsin AG, are all attempting to claw back these

21  homes and whatever.  So the business of FTE because of the

22  foisted assets which are being pursued in Delaware, a separate

23  federal question or basis for removal, is dealing with this

24  mess.  There's --

25        THE COURT:  So what is -- what is your group's interest

—2:25-cv-01927-ART-EJY—

1  in not sharing that information --

2          MR. CEREGHINO:  Well --

3          THE COURT:  -- if it's so unimportant?

4          MR. CEREGHINO:  -- I guess I would delineate.  I don't

5  know that the financial books and records would necessarily be a

6  problem.  Okay?

7          THE COURT:  Okay.

8          MR. CEREGHINO:  The problem comes when they ask for

9  litigation files and when they want the authority to tell the

10 attorneys, "Stop prosecuting appeals or claims against us."

11 It's just a circumvention of our litigation rights.  FTE still

12 has -- because, by the way, Judge Kishner did not decide, which

13 is why they won't point to you a paragraph, in that

14 exceptionally long decision nowhere did it say there is a change

15 of control.  What it said is on this day a vote happened.

16 Great.  And on this day a vote happened.  Great.

17         THE COURT:  And the provisions --

18         MR. CEREGHINO:  Neither of them --

19         THE COURT:  And the bylaws are amendments by which

20 those votes happened --

21         MR. CEREGHINO:  Are valid.

22         THE COURT:  Are valid.  Okay.  So you agree --

23         MR. CEREGHINO:  Neither of which says -- sorry.

24         THE COURT:  So you agree that -- like, that a lawsuit

25 to determine corporate control is necessary.

—2:25-cv-01927-ART-EJY—

1          MR. CEREGHINO:  A -- a lawsuit to determine corporate

2    control is necessary, no -- well, yes, that's why we commenced

3    the new ones in front of *Innovativ* -- with *Innovativ* in front of

4    Judge Mahan and with these individuals in front of Judge Mahan

5    separately because the issue, whether they want to admit it or

6    not, is Judge Kishner is not the whole story.

7          THE COURT:  No, I understand that.

8          MR. CEREGHINO:  Okay.

9          THE COURT:  But you agree that there is a live issue on

10   corporate control which a Court could determine -- I could --

11   could determine that Judge Kishner actually did enough to

12   resolve that.  Certainly she has an order and it's on appeal.

13   You have the Judge Mahan order.  I understand your position is

14   it points in the opposite direction.  I think I got it.  Am I

15   right about that?

16         MR. CEREGHINO:  You are right enough.  You cannot

17   evaluate Judge Kishner without also evaluating Judge Mahan who

18   made a decision, by the way, under federal law.

19         THE COURT:  Okay.

20         So this is what I'm hearing about the -- so the scope

21   of the TRO is important to me.  I want to just press on two

22   issues.  One is that Judge -- I mean, I have 1450.  I can rely

23   on Judge Gall's order and just continue it.  You just made an

24   issue about, you know, her order is limited to books and

25   records.  You're raising a concern, what does that mean exactly?

———2:25-cv-01927-ART-EJY———

1  Is that unclear to you from her order?  Does her order reach the

2  litigation files that you're concerned about?

3          MR. CEREGHINO:  Well, that was the draft they

4  circulated.  She said the generic term "books and records."

5          THE COURT:  Yeah.

6          MR. CEREGHINO:  The proposed order, which the other

7  side was to prepare and circulate --

8          THE COURT:  Right.

9          MR. CEREGHINO:  -- added the words "litigation files"

10  and other things.

11          THE COURT:  Okay.  So I want to understand that.  And

12  then would you agree that I can extend her order under 1450?  Do

13  you have an issue with that?

14          MR. CEREGHINO:  I don't --

15          THE COURT:  For a limited period.

16          MR. CEREGHINO:  I don't agree, and here's -- here's

17  effectively why.  Mr. Wiley touched on the first issue, really,

18  which is -- so, first, let me -- let me, I guess, do this.

19  Plaintiffs in this particular action have pointed to the *Clean*

20  *Vision* case, I think, that Your Honor --

21          THE COURT:  Yeah.

22          MR. CEREGHINO:  -- did something similar.  Well, they

23  want to make it seem similar.  It's in fact very different.

24          THE COURT:  Okay.

25          MR. CEREGHINO:  So in the *Clean Vision* case -- we're

—2:25-cv-01927-ART-EJY—

1  going to go down various factors, various issues, that were not

2  disputed, but that are in fact a problem in this case.

3         First, no dispute there was service.  That is not an

4  issue in the *Clean Vision* case.  So we can dispense with that.

5  But, here, we got service problems on not one, but all five

6  defendants.  And I know they submitted affidavits of service as

7  to Mr. Beys and Mr. De Silva, but I can go through why those are

8  ineffective.  But suffice to say, they are.  And they certainly

9  haven't even attempted, as far as I can tell, on the other three

10 defendants.

11        Now, that's only problem number one --

12        THE COURT:  Is that why the other three defendants have

13 not responded or their views are not represented?

14        MR. CEREGHINO:  What's that?

15        THE COURT:  It seems that De Silva and Beys are the

16 only defendants whose views are represented in the motions.

17        MR. CEREGHINO:  Correct.

18        THE COURT:  Okay.  Go on.

19        MR. CEREGHINO:  So that was the first issue.  The

20 second issue was there was a written TRO, great.  And there were

21 no issues about the conditions for it.  Whatever.  There was a

22 written TRO.  There isn't that in this case.

23        Also in *Clean Vision* there was then --

24        THE COURT:  But, I mean, understandably plaintiffs'

25 view on that is that you caused there to not be a written TRO by

———2:25-cv-01927-ART-EJY———

1  removing -- to as quickly grab this case from State Court before

2  the TRO could be finalized.  And that's why they didn't post

3  bond and that's why there's no written TRO.

4        MR. CEREGHINO:  Okay.  So the problem is there are --

5  as we all know, multiple things can be happening at once in

6  litigation, right.  And there is nothing in the removal

7  statute -- all it says is 30 days.  We did it in 14.

8        THE COURT:  Okay.

9        MR. CEREGHINO:  So what's the problem?  I don't

10  understand the -- I know that the timing isn't what they

11  wanted --

12        THE COURT:  I'm not saying you couldn't -- I'm not

13  saying you couldn't remove.  I'm just saying it's kind of a

14  funny factor to make a distinction with *Clean Vision*, but --

15        MR. CEREGHINO:  Well, we have our timeline that we are

16  entitled to and there's no case authority that says anything to

17  the contrary.

18        THE COURT:  Okay.

19        MR. CEREGHINO:  So we had our 30 days.  We then go to

20  this a hearing on short notice which, again, kind of like the

21  emergency designation here, I'm struggling to see the emergency.

22  But it was truncated, not by our request, right.  So they

23  manipulated the timing, got it shortened.  We had to do

24  something there, and then we expeditiously removed, especially

25  when Judge Gall independently said, "Holy smokes.  Yeah, guys,

—2:25-cv-01927-ART-EJY—

1    like, it's not hard to notice BK issues" --

2         (Court reporter interruption and clarification.)

3         MR. CEREGHINO:  BK issues, bankruptcy issues.  I'm

4    sorry.

5         So the timing thing is not an issue unlike, by the way,

6    in the *Clean Vision* case because you had the TRO and then you

7    had six weeks of preliminary injunction briefing.  Well, my

8    arithmetic is six weeks is longer than 30 days.  So then you had

9    a question of, oh, well, this removal seems to be either

10   tactical or it's at least outside the parameters of the time.

11   Oh, and, by the way, there was a written TRO as well that no one

12   disputes the effectiveness of.  So, again, we are getting

13   farther and farther away from the pen.

14        In addition, there was actually an evidentiary hearing

15   in that -- in that case at the State Court level before it was

16   removed.  We didn't have that.  So -- so, no, the confidence

17   with which --

18        THE COURT:  Did you ask for an evidentiary hearing?

19        MR. CEREGHINO:  And on top of that --

20        THE COURT:  Did you ask for an evidentiary hearing?

21        MR. CEREGHINO:  Did we ask for one?  It was their

22   burden to have it.  She was going to set it.  Fine.  But we

23   removed, which was our right.

24        THE COURT:  Okay.

25        MR. CEREGHINO:  So, let me think here.

—2:25-cv-01927-ART-EJY—

1          So, anyway, multiple factors distinguishing that

2    situation.  And by the way -- and then, again, I do want to get

3    back to it, and I -- I know I've belabored it a bit and so --

4    but Judge Gall says presumptive validity of Kishner -- Judge

5    Kishner's decision.  Fine.  But she can only have presumptive

6    validity of Judge Kishner's decision as to what it actually

7    said, which is not -- nothing was changed of control.  The two

8    bylaw amendments they wanted were you can't issue shares to

9    certain people and there can't be a change of control without

10   certain things happening.  Well, by definition that means there

11   wasn't a decision on change of control.

12          THE COURT:  Okay.

13          MR. CEREGHINO:  So there was -- so her presumptive

14   validity was, A, misplaced and, B, ignored that Judge Mahan said

15   certain people that Judge Kishner included to arrive at her

16   decision are not in fact valid shareholders.  So we have to

17   go -- actually, we don't stop at Kishner.  We have to go the

18   whole breadcrumb trail and say, well, at the very least we have

19   to cross out these people.  And once we do that, the math

20   changes.

21          This then spins us to Delaware where they like to say

22   the Delaware court said, "Mr. Szkaradek, you can vote validly."

23   So, again, the issue -- which I suppose Judge Kishner may have

24   misunderstood.  The issue in that case, according to her own

25   language in her order in June 2022, was not about the physical

—2:25-cv-01927-ART-EJY—

1  act.  It was about the validity of the physical act of voting.

2  Okay?

3          So I'm going to give an analogy real quick.  A car

4  thief has physical possession of a car.  Does that make it

5  valid?  Or is that a separate question?  The validity of the

6  possession, the validity of exercising the rights to the car is

7  different.

8          THE COURT:  Did you raise all of your Mahan-based

9  issues in the Kishner --

10          MR. CEREGHINO:  Yep.

11          THE COURT:  Okay.  So those -- so Judge Kishner knows

12  all about those, and those are parked with Judge Kishner's order

13  on appeal at the Nevada Supreme Court.

14          MR. CEREGHINO:  They are, but they are also -- well,

15  the -- the Mahan decision itself is parked, now here, to get

16  from a Federal Court an answer as to what the federal question

17  means down the chain, right.

18          THE COURT:  And can you remind me, was the Mahan

19  decision final and was it appealed?

20          MR. CEREGHINO:  It's in the exact same position that

21  Judge Kishner is.  It has been appealed by Innovativ up to the

22  Ninth Circuit.

23          THE COURT:  And it's pending there.

24          MR. CEREGHINO:  It's pending.

25          THE COURT:  Okay.

—2:25-cv-01927-ART-EJY—

1          MR. CEREGHINO:  So to use their language, it's

2    presumptively valid.  And what it says is TTP8 never acquired a

3    share.  Well, if they didn't acquire a share and this was

4    decided both for Judge Kishner ruled, I'm not sure how TTP8 was

5    allowed to be counted as one of the shares in her decision.

6          THE COURT:  So Judge Kishner knew about all of the

7    Mahan issues.  Those issues are pending on appeal.  Judge

8    Kishner -- I don't know what she said exactly.  I can't remember

9    exactly what she said, but she obviously took it into account

10   and decided in -- in a way -- in direct conflict to Mahan in

11   your opinion.  So one of these arguments is going to win.  It

12   sounds like a timing issue.

13         MR. CEREGHINO:  Yeah.

14         THE COURT:  Whoever gets there first.

15         MR. CEREGHINO:  I suppose.

16         THE COURT:  And you've moved to stay her decision,

17   Judge Kishner's decision?

18         MR. CEREGHINO:  Yeah.

19         THE COURT:  And that's still pending, that motion?

20         MR. CEREGHINO:  Still pending.

21         THE COURT:  Okay.  All right.

22         MR. CEREGHINO:  But now in terms of emergency, I want

23   to get to this piece of this because, again, I think, right,

24   this -- this is an emergency motion to enter this TRO.  So the

25   emergency piece --

2:25-cv-01927-ART-EJY

1          THE COURT:  Well, let me ask you.

2          MR. CEREGHINO:  Sure.

3          THE COURT:  You mentioned that there wasn't an

4  evidentiary hearing.  It was their burden to show irreparable

5  harm.  You think they haven't shown it.

6          MR. CEREGHINO:  Yeah.

7          THE COURT:  Don't you think their stage for doing that

8  is a hearing on a preliminary injunction?  Where --

9          MR. CEREGHINO:  Well --

10          THE COURT:  I mean, shouldn't we be setting an

11  evidentiary hearing on a preliminary injunction so that they can

12  show that the harm is irreparable?

13          MR. CEREGHINO:  When they file one.  So they filed

14  the -- a motion for TRO.

15          THE COURT:  They've argued that they thought it was

16  preserved, but, I mean, they could file one now.

17          MR. CEREGHINO:  Okay.

18          THE COURT:  Right.

19          MR. CEREGHINO:  Because the issue is -- but they have

20  to do it in the proper course, right, to allow us to respond to

21  it in briefing to prepare for said hearing.  Because right now,

22  though, all we have are allegations.

23          THE COURT:  Understood.

24          MR. CEREGHINO:  There is no support for any of their

25  contentions about irreparable harm.

—2:25-cv-01927-ART-EJY—

1          THE COURT:  Understood.

2          MR. CEREGHINO:  So why would we go beyond the initial

3   step to setting this preliminary injunction?  When they prepare

4   a properly supported motion, then we can have that hearing.

5   That's fine.

6          THE COURT:  Yes.  Okay.

7          MR. CEREGHINO:  Yeah.  We're happy to have that

8   hearing, when it's done correctly.

9          THE COURT:  Okay.

10          MR. CEREGHINO:  So I hope that addresses, first of all,

11   the 1450 issue.  It's not as clean as -- as they make it seem,

12   and that case in particular is very distinguishable.

13          THE COURT:  I think the authority that they're

14   relying -- I mean, I think they're relying on *Clean Vision* as an

15   example.  The authority is really 1450, which is there as a

16   statute just --

17          MR. CEREGHINO:  Right.

18          THE COURT:  -- in the way that the bankruptcy "related

19   to" statute is there.  I mean, those are just framing the

20   issues.  So we don't need to get hung up on a specific example.

21          MR. CEREGHINO:  Okay.  Fair enough.

22          THE COURT:  Because we can just apply those statutes.

23          MR. CEREGHINO:  So, again, real quick, saying that

24   someone wants something does not an emergency make.  So great.

25   So they haven't demonstrated an emergency.

1          There's no evidence to support it.

2          THE COURT:  I think I'm good.  I can hear from --

3    unless you wanted one more point, you really need to make right

4    now.

5          MR. CEREGHINO:  Sure.

6          THE COURT:  I would like to hear from plaintiffs.

7          MR. CEREGHINO:  I just wanted to get real quick into --

8    well, I think you can understand where we come from on

9    likelihood of success.  I won't belabor that point.  Point being

10   that even if they do have that, they have to have demonstrated

11   irreparable harm.  There isn't any.  We can do this in the

12   normal course.

13         Let's see here.  Balance of equities, I mean, I guess

14   just real quick to touch on as between the parties, I guess.  So

15   you've got Mr. Beys, a former U.S. District Attorney in New

16   York, clean record.  Mr. De Silva, who's in the regulated

17   financial industry, so his character is reviewed, clean record.

18   Then you've got a bunch of individuals who in the past and

19   currently are working together with a convicted felon who's also

20   had issues with District Judge Mahan and the SEC.  That's

21   Mr. Singal and Mr. Szkaradek who are now in Poland because they

22   don't want to face the consumer fraud charges --

23         THE COURT:  Hold on.

24         MR. CEREGHINO:  -- or the suits they're facing now.

25         THE COURT:  Can I just ask you a quick question?

2:25-cv-01927-ART-EJY

1          MR. CEREGHINO:  Sure.

2          THE COURT:  My understanding of the allegations in the

3    bankruptcy -- in the complaint regarding the bankruptcy is that

4    Mr. Beys is a creditor of the subsidiaries.

5          MR. CEREGHINO:  I didn't see that, but, again, I don't

6    -- if you can point me to that or just read it out loud.

7          THE COURT:  No, it's okay.

8          MR. CEREGHINO:  So they're alleging that Mr. Beys as an

9    individual is a creditor of the subsidiaries?

10         THE COURT:  Well, it just says in Paragraph 32 that

11   after receiving Judge Kishner's judgment -- I'm going to --

12   "Beys in direct contradiction to that judgment caused several

13   FTE subsidiaries into Chapter 7 bankruptcies in which Beys,

14   Fernandez, and Scheidmann are listed as primary creditors."

15         So I was unclear -- I can ask plaintiffs about that.

16         MR. CEREGHINO:  Yeah, I'm not --

17         THE COURT:  I was unclear whether that's an allegation

18   that he basically was out of control, but attempting to cash

19   out.

20         MR. CEREGHINO:  I would -- I would endeavor -- and

21   please correct me if I'm wrong.  I would endeavor to think that

22   they are saying that those three individuals might be listed as

23   the director -- directors of the subsidiary entity who signed

24   off on the petition, but I don't know that they individually are

25   creditors --

2:25-cv-01927-ART-EJY

1          THE COURT:  Okay.

2          MR. CEREGHINO:  -- of those particular entities.  They

3   might be.

4          THE COURT:  That's just what's --

5          MR. CEREGHINO:  Certainly Mr. Beys might be.

6          THE COURT:  -- alleged.  I don't know what's -- I don't

7   know if it's true.

8          MR. CEREGHINO:  Yeah, I don't know.

9          THE COURT:  I'm just looking at the allegation.

10         MR. CEREGHINO:  Yeah.  So in any -- in any effect, Your

11  Honor -- oh, sorry.  And then to the public interest issue, if I

12  could real quick.

13         FTE's -- this FTE's, the correct FTE's, positions in

14  all the cases, Delaware, Southern District of New York, Nevada

15  before District Judge Mahan, the new ones, are all permeated

16  with fraud.  Okay.  There's no public interest in allowing

17  fraudsters to benefit from their fraud.  That's number one.

18         Is there a public interest in allowing a single State

19  Court judge to ignore prior binding federal decisions or to have

20  the tail wag the dog in that sense?  No.  The public interest is

21  in a cohesive, collaborative, consistent judiciary --

22  rule-following judiciary.

23         Is there public interest -- interest in allowing what

24  they want?  So we've heard the discussion about stability.

25  Stability in almost every context -- injunctive context I can

—2:25-cv-01927-ART-EJY—

1  think of is status quo ante, not status quo after, right.  And

2  so -- and because we have these pending appeals -- but that's

3  really what they want.  They want an order that says they can

4  stop the litigation, fine.  But that's not in the public

5  interest.  The public interest is to allow the procedures to

6  follow where they are and are allowed to go which includes

7  appeals.

8        THE COURT:  But that would also mean that if you got

9  your stay in the Nevada Supreme Court, you would want me to

10  respect that --

11        MR. CEREGHINO:  I mean --

12        THE COURT:  -- right?

13        MR. CEREGHINO:  -- to a certain extent everything

14  should be stayed and we should just wait for Nevada.

15        THE COURT:  Absolutely.  And until the Nevada Supreme

16  Court does that, I'm going to honor the latest judgment from the

17  State Court, it seems.  I mean, that does seem valid or at least

18  a valid concern.

19        MR. CEREGHINO:  Okay.

20        THE COURT:  Okay.

21        MR. CEREGHINO:  So in what respect?  Because we didn't

22  actually get an entered order that delineated -- I'm saying in

23  terms of what is actually allowed.  So we have to go through

24  that process of -- if you're going to allow access to books and

25  records, fine, but what are they and are they really supported

─────2:25-cv-01927-ART-EJY─────

1   by --

2            THE COURT:  That's a separate issue --

3            MR. CEREGHINO:  Yeah.

4            THE COURT:  -- that I -- okay.  Thank you.  I think

5   I've -- I'm ready to hear from plaintiffs.

6            MR. CEREGHINO:  Thank you.

7            THE COURT:  Okay.  Who's going to speak on the last

8   word here to wrap up?

9            MR. CLEMENT:  I'll address the -- I think we'll

10  probably keep the same segment.  I'll keep to the remand --

11  motion to remand issues.

12           THE COURT:  I think I'm done with the remand.

13           MR. CLEMENT:  Oh, okay.

14           THE COURT:  I mean, I haven't been persuaded that we're

15  remanding this.  I'm keeping this case, I think.

16           MR. CLEMENT:  Can I just make one comment on this

17  point?

18           THE COURT:  Sure.

19           MR. CLEMENT:  I realize you're trending against me.  I

20  respect that.  One of the three cases that was reassigned to you

21  from Judge Mahan is a case that this FTE group filed against the

22  three individuals that I represent who claim to be directors and

23  officers pursuant to election, essentially flip side of the

24  Judge Gall case --

25           THE COURT:  Yes.

—2:25-cv-01927-ART-EJY—

1          MR. CLEMENT:  -- and this other.  That case doesn't

2   involve bankruptcy.  Obviously I think you're going to see a

3   subject matter jurisdiction motion there as well, but I just

4   wanted to point out that I don't think that they think that the

5   core issue about authority has got anything to do with

6   bankruptcy, and that's according to their own lawsuit.

7          THE COURT:  Okay.

8          MR. CLEMENT:  Just wanted to, kind of, point that out.

9   But if you don't have any other questions on remand --

10          THE COURT:  Okay.  Good.

11          MR. CLEMENT:  -- then I'll move on.  Okay.

12          MR. WALTHER:  Thank you.  Eric Walther for FTE.  And

13   I'll focus on the irreparable harm because it seems like that

14   would be --

15          THE COURT:  Yes, yes.

16          MR. WALTHER:  -- what the Court's most interested in

17   here.

18          So on the books and records, I mean, I heard

19   Mr. Cereghino ask, you know, what is the need for the books and

20   records.  A few things.  I mean, this is the current

21   duly-elected board with fiduciary duties.  They need the books

22   and records to operate the company or they could be violating

23   their fiduciary duties.

24          Something that Mr. Cereghino said that was very

25   concerning to me that's new for my information is that the

1  company's not operating.  He made it seem like it's on the brink

2  of collapse.

3        That's very concerning when we have a company that

4  before those comments we -- we believed to still have assets and

5  be operating, which is I think a very good example of why these

6  books and records in addition to some of this other relief that

7  we're requesting is needed here.

8        THE COURT:  It seemed to me like the books and records

9  were not the hang-up, but the litigation files were the hang-up.

10  So I'm wondering just in the -- in the desire for your client to

11  get as much information as quickly as possible whether the books

12  and records piece of it could be resolved.  And then the --

13  while you chew on the litigation piece of it so that there's --

14  whatever, if you need a protective order kind of thing.

15        MR. WALTHER:  I think that's right, Your Honor.  So I

16  think the immediate need here are the books and records.  We

17  need a picture of the financials here.  And I know that there's

18  a reason why they've fought so hard to hand these things over,

19  but I'm fine with having the fight about who gets the company's

20  litigation files on another day.  The immediate need here to

21  avoid what we think is going to be a disastrous result if this

22  doesn't happen are these books and records so we can get a full

23  picture of what's happening in this case.

24        THE COURT:  And I don't mean for you to let go of the

25  litigation.  I just mean there could be a process --

1          MR. WALTHER:  Sure.

2          THE COURT:  -- that's designed to resolve that, either

3    you resolve it on your own or with a motion or something like

4    that.  But if you really want the financial information, it

5    seems like you can separate those two.

6          MR. WALTHER:  Certainly.  I totally agree with that.

7          THE COURT:  Okay.

8          MR. WALTHER:  And I do -- I would reserve the right to

9    address the litigation file on another day and we certainly

10   will.  But for now the books and records I think are the most

11   immediate need here.

12         And I know you've asked a couple times about whether

13   there was an evidentiary hearing, whether defendants thought one

14   was needed.  I'll tell you that -- and this is in the

15   transcript -- that Judge Gall did set this for a preliminary

16   injunction hearing.  It was supposed to happen two days ago.

17         THE COURT:  Yeah.

18         MR. WALTHER:  And set a briefing schedule to give them

19   even more time to participate and give a more fulsome briefing

20   on the preliminary injunction issue.  So she had set it for a

21   preliminary injunction.  We were going to have that a couple of

22   days ago.

23         And just -- and, again, on the irreparable harm piece,

24   it's I think -- especially with the comments today about the

25   company being on the brink of collapse, it causes me a lot of

1 concern.  I know it will cause this board who owes these

2 fiduciary duties and right now are handcuffed, can't do anything

3 with the company, a lot of concern.

4 　　　　THE COURT:  Okay.  I think I'm good.  I think I would

5 like to just gather my thoughts for a second and make some --

6 sort of, give some direction forward with -- so I think what

7 I'll do is kind of keep my remarks just, sort of, in the spirit

8 of a roadmap.  And then I will get out an order, kind of,

9 providing more details.

10 　　　　So, first, as you all could tell, my inclination is to

11 demand the motion -- is to deny the motion to remand because I

12 think under the Ninth Circuit case law on related-to

13 jurisdiction and preemption by the Bankruptcy Code I think

14 there's just enough here based on the complaint and what's going

15 on to very obviously connect FTE's state lawsuit and now this

16 removed case to things that are happening in Bankruptcy Court

17 and particularly control over FTE and its subsidiaries.  That

18 seems to be what FTE is very much focussed -- not the only

19 thing, but is very much focussed on what they claim is a

20 wrongful bankruptcy by these what they claim are rogue actors on

21 behalf of FTE.  So I'm going to deny ECF 5 on that ground.

22 　　　　I'm going to continue Judge Gall's TRO and set this for

23 a preliminary hearing so that we can -- so that it is a

24 temporary placeholder in order to allow, sort of, further

25 vetting, evidence, and argument on the need for preliminary

1  injunctive relief, which is obviously more permanent than the

2  TRO.

3        So I'm going to continue in place the TRO that she

4  entered by minute order.  I'm understanding and would request

5  that the parties work out a version of that TRO and it should

6  cover books and records, but if it -- it can also accept and

7  reserve to fight about separately the litigation files.  And

8  that is meant really to just get the parties in a, sort of,

9  state of knowledge that is operative for now and sufficient and

10 to share that information which does not seem to be disputed.

11 And, obviously, if there are more disputes, as they crop up,

12 those can be litigated.

13       So I'm going to have the TRO remain in effect until we

14 have a preliminary hearing date.  So I actually -- but there's

15 more that I want to know.  And I actually think it would be -- I

16 can set a preliminary hearing date, but I really would encourage

17 the parties to figure out what they want to happen next.

18       What I would like to know is whether this matter is

19 touched by the automatic stay in the Bankruptcy Court.  I think

20 it's still an issue that just I need to have it briefed because

21 I don't want to make a wrong move, and I don't understand enough

22 about FTE and its -- and the subsidiaries to be sure.  As I

23 indicated in the hearing, the Ninth Circuit law is that the

24 automatic stay doesn't extend to the debtor, but I -- to a

25 nondebtor, but I don't really understand the parties well

—2:25-cv-01927-ART-EJY—

1    enough, so -- and I think each party should address that.

2         There's also the option of a stay that is not the

3    bankruptcy stay, but me issuing a stay because of judicial

4    efficiency.  There's a case on this called *Landis*.  Let me see

5    if I can give you the citation.  I don't know if I have that

6    here.

7         There's a -- *Landis* is a Supreme Court case, but

8    there's a few cases in the Ninth Circuit including *Lockyer*, 398

9    F.3d 1098 (Ninth Circuit 2005) is one; *PG&E Corporation*, 100

10   F.4th 1076 (Ninth Circuit 2024.)  Those are two examples of

11   *Landis* stays.

12        One of the issues in a *Landis* stay is that courts get

13   reversed if they stay a case that they haven't sufficiently

14   developed and made findings on the hardships that plaintiffs

15   will -- or defendants will face or others will face if the case

16   is stayed.

17        So I raise those issues because it seems to me that

18   there must be -- I mean, it seems to me that something hasn't

19   happened that probably should happen, which is the Bankruptcy

20   Court -- and FTE is hinting that it will happen -- the

21   Bankruptcy Court should know that there's a corporate control

22   fight.  And the Bankruptcy Court should -- and then there should

23   either be -- I should be yielding to the Bankruptcy Court or the

24   Bankruptcy Court should be yielding to me or the Nevada Supreme

25   Court, whatever.  Someone should be yielding to the other to

──────2:25-cv-01927-ART-EJY──────

1  decide who's going to be deciding this issue so that everyone is

2  clear and whatever stays and other things need to happen are

3  happening and that the parties can -- and courts can, sort of,

4  fight about, sort of, what those things are.

5        So I mention those two flavors of stay, but it's in

6  connection with understanding that someone needs to go first on

7  deciding what the corporate control issue is and others should

8  be alerted so that they don't, you know, decide -- do the exact

9  same thing.

10        So I think that I should -- because this is a TRO and

11  we haven't had a hearing on the preliminary injunction hearing,

12  I think the date that I should set is the preliminary injunction

13  hearing, but I do feel that it would be helpful to have the

14  briefing on the motion -- on the stay issues prior to that.  And

15  I just wanted to -- so let me just -- looking at the calendar, I

16  think normally that would happen 28 days from when Judge Gall

17  issued her order, which I think is around November 3rd.

18        I can -- so there's a couple ways to do this.  One is

19  that you could come up with a date where you're available,

20  there's lot of people here, and coordinate with my courtroom

21  deputy about how soon you want this to happen.

22        I think that's probably best because we have a lot of

23  people here and we need to pick a date that will work without

24  moving things around.

25        So I think what I'll do is I would like to set a

─2:25-cv-01927-ART-EJY─

 1  preliminary injunction hearing within a couple of weeks, maybe

 2  around the 3rd or the 10th or around -- or so.  I will have my

 3  courtroom deputy reach out to coordinate with you on that.  I

 4  would like the parties related to that to come up with a

 5  briefing schedule on the stay issue so that I can hear from each

 6  side about whether they -- about whether a stay of some flavor

 7  should apply here.

 8       MR. WILEY:  Your Honor, Jason Wiley on behalf of

 9  defendants.

10       Clarification, as addressed during our oral argument,

11  we've never substantively opposed the motion for preliminary

12  injunction.  Can we get leave from the Court to do that in

13  addition to these stay issues?  Because I assume that we're just

14  going to adopt the motion for preliminary injunction that was

15  filed in the State Court action.  We can file a response to that

16  along with the -- the briefing issues on the stay?

17       THE COURT:  Yes, if you feel that you haven't responded

18  to it already -- I think you should -- I think you should each

19  put something on the record.  I think that the -- I understand

20  that I might inherit everything that's on the State Court

21  record, but it probably makes sense for plaintiffs to decide

22  whether that's what they're relying on and then to give

23  defendants an opportunity.  So it really -- it literally could

24  be a one-page thing saying "we're good with this" or it could be

25  a different version, and then we could give you an opportunity

─────2:25-cv-01927-ART-EJY─────

1   to respond.

2          And so that's -- as we're picking a preliminary

3   injunction hearing date, if we're also contemplating briefing on

4   all -- on the preliminary injunction again, we need to take that

5   into account as we set the date for the hearing.

6          MR. WILEY:  Thank you, Your Honor.

7          THE COURT:  Okay.  So with that, let me just conclude

8   by saying, I am denying the motion to remand.  I am granting the

9   TRO.  I just want to say a few issues about the TRO which is

10  really adopting -- relying on what Judge Gall said.  I do think

11  that the plaintiffs are likely to succeed on the merits on their

12  issue of -- what they've said so far on their issue of corporate

13  control.  They have made allegations of irreparable harm.  One

14  of those allegations I believe goes to the bankruptcy issue, so

15  I've addressed that a little bit already.  And then the other

16  goes to the books and records, which is why I'm ordering the

17  books and records in that tailored -- tailored to the books and

18  records to be part of the TRO order.

19         I think the balance and equity tips in the plaintiffs'

20  favor because of the -- you know, understandably from Judge Gall

21  in light of Judge Kishner's order that puts strong weight in

22  their favor that as long as the transfer of power was pursuant

23  to that order, it was likely to be valid.  And I don't want to

24  revisit Judge Kishner's order, but I'll just take it on fact

25  that that's what the state of play is now.

1        And then the injunction is in the public interest.  I

2   mean, I understand this is the corporate control.  It's not in

3   the public interest to have people acting without authority, but

4   given the makeup, I do feel that the authority -- it kind of

5   goes back to the issue of authority and I feel like that's in

6   plaintiffs' favor.

7        So based on that I'm going to continue the TRO, and

8   then we will evaluate -- reevaluate at the preliminary

9   injunction hearing and particularly focus on the irreparable

10  harm issue as well.  But, of course, I'm happy to look at all

11  the factors again.

12       So with that, are there any additional questions for

13  me?  Yes.

14       MR. CLEMENT:  I have two, Your Honor.  I might have

15  missed this, but for the preliminary injunction hearing it's

16  true that -- I mean, we've seen bits and pieces of the

17  opposition to the motion for TRO, but we really have not seen

18  merit -- a merit-based argument from -- from my opposing

19  counsel.

20       I don't know how fact intensive that defense is going

21  to be.  I mean, I just really don't know at this point, and I

22  think this is something I raised in front of Judge Gall.  Do you

23  want to set a preliminary injunction hearing as a motion hearing

24  first or do we just -- are we just setting an evidentiary

25  hearing out of the gate?  Because it may or may not be -- you

—2:25-cv-01927-ART-EJY—

1  know, the facts from my standpoint are very limited.  A majority

2  vote, it happened.  That's it.

3          THE COURT:  So I am mindful of wanting to move quickly.

4          MR. CLEMENT:  Yeah.

5          THE COURT:  But I do feel like there's complexity here.

6          MR. CLEMENT:  Yeah.

7          THE COURT:  And it seems to me that the first move is

8  whether either you're doing any amendment to what you already

9  filed because obviously we want to give the defendants an

10  opportunity to respond on the merits, and then I think you could

11  if -- my sense is if there's a need for an evidentiary hearing,

12  you can tell me that and also tell me what is -- what is it that

13  you -- the scope of that hearing is something that you could

14  represent in your briefs.

15          MR. CLEMENT:  Okay.  I just think --

16          MR. WALTHER:  Sorry.

17          MR. CLEMENT:  -- from my standpoint -- sorry -- I'm not

18  sure I'll know -- and this is -- it might have not come out

19  right.  But I'm not going to know whether I feel like we need

20  evidence until I see their opposition.  So that's my thought

21  process is just what -- how are we setting that hearing today.

22          THE COURT:  There's a lot of people here.

23          MR. CLEMENT:  Right.

24          THE COURT:  So I suggest that we have a working

25  schedule that allows for their response and you some prep time

2:25-cv-01927-ART-EJY

1  with the understanding that you all may need -- you all may

2  decide that you actually need more time, and they're subject to

3  a TRO so they might be opposed to that.  But I would say you

4  should schedule -- we should schedule something that allows you

5  to get the briefing done and the prep done that you think you're

6  going to need.

7       You're also going to want to look at the books and

8  records, but then with the understanding that if the parties

9  were to come to me and say -- mostly because you have to find a

10 date when you all can be there.  That's going to be hard in

11 itself.

12      And then as that date comes closer or briefing is

13 coming in and you think that you need to move that date, that's

14 something that you all can address and bring to me.

15      MR. CLEMENT:  Understood.

16      THE COURT:  I don't think there's any other way to do

17 it really.

18      MR. CLEMENT:  My only other second question is I assume

19 that the bond -- do you want to do something different than what

20 Judge Gall did?  We need to post a bond to make the TRO

21 effective.

22      THE COURT:  I think that we should just proceed as you

23 would have done in Judge Gall's --

24      MR. CLEMENT:  Okay.

25      THE COURT:  -- court with the bond.  So I'm going to

———2:25-cv-01927-ART-EJY———

1  have that be the order.  And then -- and just with a simple TRO

2  that just is not -- I understand they oppose the TRO, but that

3  is not controversial and, kind of, gets the status quo --

4  preserves it for our preliminary injunction hearing.

5          MR. CLEMENT:  Understood.  Okay.

6          MR. WALTHER:  Just a very quick question, and this goes

7  to the timing of the additional briefing, too.  With the books

8  and records, is it possible to get some sort of timeline on when

9  we can expect them just to -- so we -- I mean, we're going to

10  want the books and records to evaluate whether we need evidence

11  or if there should be supplements to the existing motion for

12  preliminary injunction.

13          THE COURT:  I think I'm directing you to -- I mean, is

14  there a date by which you can commit to the books -- handing

15  over the books and records?  Because that could just be built in

16  as part of my order, or it's something that I could leave to you

17  to actually go home and figure that out so that we have that

18  transition happen.

19          MR. WILEY:  Your Honor, on behalf of defendants I think

20  you can leave it to us to figure it out because there are some

21  variables, i.e., when they post the bond to effectuate the TRO.

22  So, you know, once that occurs, then, yeah, we can get together,

23  and if there's any issues, then we can contact Your Honor.  But

24  I think that based upon Your Honor's ruling the parties can

25  get-together and figure it out.

—2:25-cv-01927-ART-EJY—

1            THE COURT:  Okay.  What I'm going to do is I'm going to

2   issue a ruling that memorializes some of this.  I'm going to

3   issue a minute order that directs you how long do you need to

4   file a stipulation TRO that has a schedule in it that includes

5   that.  So I think it would be basically a rendition that's less

6   controversial of Judge Gall's TRO, but that sets out the dates

7   for transfer and that doesn't have -- this is just getting a

8   draft that schedules it so that there can be compliance and it's

9   feasible.

10           What time do you need to file that sort of barebones

11  TRO with a schedule?  Like a week?

12           MR. CLEMENT:  That's probably...

13           MR. WALTHER:  I would think just a few days, Your

14  Honor.  I mean, really early to mid next week.

15           MR. CLEMENT:  Yeah, Wednesday.

16           MR. WALTHER:  Yeah, Wednesday would --

17           THE COURT:  Okay.

18           MR. WALTHER:  By Wednesday I think would be --

19           THE COURT:  Close of business Wednesday?  Does that

20  work for you?

21           MR. WILEY:  Well, again, provided that they get us a

22  draft timely here in the next couple of days.

23           THE COURT:  Why don't we do it close of business

24  Friday?

25           MR. WILEY:  Yeah.

———2:25-cv-01927-ART-EJY———

1          THE COURT:  Next Friday.  So that will be the basic

2    terms of the TRO, books and records, and the other aspects of

3    Judge Gall's order.  I'm repeating it.  You can work off of her

4    minute order as the template.  And it will also include a

5    deadline for transferring the books and records.  And if it

6    hasn't already happened that you've posted the bond -- it will

7    either represent that you've posted the bond or represent the

8    timing of posting the bond related to that.

9          Then you'll separately -- you can separately confer on

10   the preliminary injunction hearing date, and then I will -- you

11   can reach out to my courtroom deputy or she'll reach out to you

12   on that so that you can generate a stipulation relative to that.

13   We'll pick a date.  We'll have briefing schedules that go along

14   with that date.  Obviously things can move, but at least it will

15   give us all a working schedule.

16          MR. CLEMENT:  Perfect.

17          THE COURT:  Okay?  Thank you everyone for being here.

18          MR. WILEY:  Thank you.

19          MR. CLEMENT:  Thank you, Your Honor.

20          MR. WALTHER:  Thank you.

21          (Whereupon the proceedings concluded at 2:53 p.m.)

22

23

24

25

2:25-cv-01927-ART-EJY

1                                  --oOo--

2                    COURT REPORTER'S CERTIFICATE

3

4        I, PATRICIA L. GANCI, Official Court Reporter, United

5   States District Court, District of Nevada, Las Vegas, Nevada,

6   certify that the foregoing is a correct transcript from the

7   record of proceedings in the above-entitled matter.

8

9   Date:  October 29, 025.

10                                    /s/ **Patricia L. Ganci**

11                                    Patricia L. Ganci, RMR, CRR

12

13

14

15

16

17

18

19

20

21

22

23

24

25